MARY MITCHELL, RESPONDENT, v. DR. W. E. POOLE, APPELLANT.—68
S. W. (2d) 833.

St. Louis Court of Appeals.   Opinion filed March 6, 1934.

(1)

*Woodward & Evans* for appellant.

*A. G. Schumacher* and *Clarence G. Baxter* for respondent.

BECKER, J.—Plaintiff, in her action for malpractice, seeks to recover damages against defendant for injuries alleged to have been sustained as a result of a hypodermic needle breaking off and lodging in her gums during a tooth extraction. At the trial there was a verdict and judgment for the defendant, but subsequently the trial court sustained plaintiff's motion for a new trial and the defendant in due course appeals.

The petition in substance charges the defendant with the following acts of negligence: First, that the defendant negligently and carelessly used a hypodermic needle that was old, worn, weak, unsafe and inadequate; second, that the defendant carelessly and negligently used said hypodermic needle in such an unskillful manner that the needle broke and part thereof became lodged in plaintiff's gum; third, that the defendant proceeded to extract the tooth in such a careless, negligent and unskillful manner that parts of the tooth remained in the gum and mouth of plaintiff; fourth, that defendant, after extracting the tooth, carelessly, negligently and unskillfully proceeded to probe in and around the cavity and mouth in a futile attempt to remove the broken needle.

To these assignments of negligence defendant's answer sets out that he used an approved hypodermic needle purchased from a reputable manufacturer and that said needle broke without any negligence or fault on his part either in the choice or selection of the needle or in the manner in which it was used. The answer further states that hypodermic needles, even when handled with the greatest care and handled with the greatest skill, do occasionally break; that the needle in question had been sterilized prior to its use and that following the extraction of the tooth plaintiff's gum and jaw were tender and sore and that for said reason it was not advisable to probe or dig into plaintiff's gums for the purpose of extracting the portion of the needle which broke off in the gum at that time; that defendant accordingly advised plaintiff to delay a few days until her gums

and jaw were sufficiently healed to enable defendant to extract the portion of the needle without undue pain and suffering to the plaintiff; that plaintiff agreed to this procedure and did in point of fact return several times for treatment of the infection of the root socket where the tooth had been removed, but that after the third visit plaintiff refused to cooperate with him and failed to return for proper treatment and thereby discharged him from the case and from any liability therein.

Plaintiff's reply put in issue the new matter in defendant's answer.

Plaintiff's own testimony was to the effect that on January 13, 1930, she had gone to the office of Dr. Poole, the defendant herein, for the purpose of having him treat her teeth; that her lower left third molar had been bothering her some and had been aching; that the top of the tooth was partially broken off and it had been filled; that Dr. Poole removed the filling and cleaned out the cavity and told her that he would not pull the tooth in its then present condition and for her to come back a few days later; that on January 20, 1930, accompanied by her daughter, she went back to Dr. Poole's office for the purpose of having the tooth extracted; that Dr. Poole, before pulling the tooth, injected something into her gums with a hypodermic needle; that she did not see the hypodermic needle prior to the time that the doctor made his injections; that Dr. Poole injected the hypodermic needle first into the gum on the inside of her mouth and then made two injections into the gum on the outer or buccal side of her jaw; that at the third injection the needle broke; she heard it "pop off;" that Dr. Poole then proceeded to extract the tooth, which took about half an hour. "Dr. Poole did not say anything about the needle breaking until after he had pulled the tooth. He probed down in the socket for quite a while. I didn't think he had all the tooth out and he said he was looking for the needle. He never did say anything about a part of the tooth being left in the cavity. I don't know how long he continued to probe around there. It was quite a little bit. The socket got so sore I could not stand it when he was looking for the needle. . . . When I told Dr. Poole that it hurt me he said for me to go home and rest up and later on I should have an X-ray made. . . . He spent quite a little time in putting this anesthetic in my gum. I figure it took him about half an hour to actually pull the tooth. I imagine he spent about ten minutes in probing the gum after he had pulled the tooth. . . . I went back to Dr. Poole on January 22nd, 23rd and 24th. On the 22nd he washed out the socket and said he would have to have an X-ray before he could locate this needle." On the 24th Dr. Poole cleaned out the socket again. Plaintiff further testified that after the tooth was extracted "my whole jaw was swollen and the leader down in my neck was swollen and the back of my neck was sore and in fact my whole head was sore. . . . This swelling and soreness got worse from

the 20th up until the last day I saw Dr. Poole.'' Though Dr. Poole had told her to return again after the treatment on the 24th, she did not go back to him but called on her family physician, a Dr. Jones, who examined her and took her in to his associate, a dentist, Dr. Schlueter, who told her that he would have to treat the socket; that she made eight visits to Dr. Schlueter, during which he continued treating the socket, and, at his direction, plaintiff had X-ray pictures taken; that the condition seemed to get worse and she then went to see Dr. Kitchell; that she continued to see Dr. Kitchell every three or four days for about a month. At each visit Dr. Kitchell cleaned out and treated the cavity, and on one occasion took out two pieces of bone; that Dr. Kitchell ultimately removed the piece of the needle from her gum, which he gave to her; that she saw Dr. Kitchell but once after the needle was removed.

On cross-examination plaintiff testified that Dr. Poole did not do any probing around there before pulling the tooth; that the needle ''was kind of in back of the tooth and on the outside;'' that Dr. Poole told her that he would have to treat the gum where the tooth had been removed before he could take out this needle; ''he probed around in the socket after the tooth was extracted. He cleaned it out with cotton. . . . He used some kind of an instrument. This probing that I speak of was done on the socket and the needle was on the upper or outer part of the gum just to one side of the tooth. I went back the second day after he extracted the tooth. At that time he put some more cotton in there and again cleaned or washed out this socket. . . . I did go back three days in succession. Each time he treated the socket where the tooth had been. . . . As far as I know practically the same treatment was given by Dr. Schlueter as had been given by Dr. Poole. My gum and jaw were swollen pretty bad when I went to Dr. Schlueter. . . . It hurt me worse afterwards and continued to swell. Dr. Schlueter never did attempt to remove the needle but confined his treatments to the socket where the tooth had been.''

As to treatment by Dr. Kitchell, plaintiff stated that he ''would clean out the socket and put some medicine in there. He finally· took out these particles of bone and this needle. . . . I kept it (the needle) at home for a while, sticking it in a little cork in an envelope. I did not keep it in an airtight box.''

On re-direct examination plaintiff testified that immediately after Dr. Poole had gotten the tooth out he told her he was looking for the needle. ''I couldn't tell just where he was probing. It was back in around the socket somewhere. It was all back in there; I mean inside of my mouth. I think he probed both inside of the cavity and on the outside of the gum.''

Audrey Burke, the daughter of plaintiff, testified she was present when Dr. Poole extracted the tooth; that she heard the doctor say

that the tooth had to come out and heard him state about the needle breaking off. "He didn't tell her about it right away but probed around a little while and then said the needle was broken off in the gum. I think he probed around for about ten minutes and I heard my mother state it hurt her too badly, and she could not stand it any more. Dr. Poole then said he would have to leave it go another day and clean it out again." According to this witness, during the time the tooth was being extracted she was "sitting in an adjoining room with a door between open."

Dr. E. A. Kitchell testified that when plaintiff came to him her jaw was quite badly swollen and there was considerable pus; that he treated the socket and sent her to have X-ray pictures taken, which plaintiff brought back to him. Dr. Kitchell testified that after he had been treating plaintiff for a while he removed some process, that is a bony substance; that "we generally speak of the teeth as setting in that bone or in the alveolar process and it is a sort of honeycombed bone above the jawbone proper. Some of that was broken down in this case and later broke loose and I removed these pieces. The effort in extracting the tooth would cause this bone to break down. The process is not a part of the tooth but part of the bone."

On cross-examination, with reference to his treatment of the socket, Dr. Kitchell testified that "this treatment was not because of the presence of the needle but because of infection of the root socket. I would not attempt to remove the needle until I had cleared up this infection in the root socket. . . . The X-rays do not show that the needle itself was involved in any infection. . . . In my opinion the infection had been a pre-existing infection. There is nothing unusual in having an infection which requires some time for treatment after the removal of a wisdom tooth whether there is a needle there or not. Quite often you will have such an infection and this is true regardless of what the dentist does or what degree of skill he uses, and depends largely upon the condition of the tooth previous to the extraction." As to the particles of the bony process which he removed from the root socket, he testified that "when the tooth is difficult to remove there is nothing unusual about the pieces of that process breaking off during the extraction. This is quite often true in third molar extractions, which are often the most difficult teeth to extract. This process might become broken loose regardless of the fact that the dentist might use the highest kind of skill and care. Nothing the dentist can do can prevent it."

With reference to the character of the hypodermic needles used by doctors in their work, he stated that "there is no one definite type of needle used by doctors in giving an anesthetic preparatory to the extraction of a tooth. That depends upon the choice of the operator. The style of needle, the length and thickness of it, and the material out of which it is manufactured all enter into it. There are no needles

used in the dental profession which will not break. I could not say they would not break if properly handled in injecting the hypodermic in the jaw.''

On cross-examination he stated that the use of a particular type, or of a particular model of hypodermic needle, depends entirely on the election or choice of the particular dentist using it, ''needles will break in spite of all the care and skill that a dentist may use. The long type of needle, which was exhibited here, sometimes break. In my experience I have seen that type of needle break. The breaking of a needle does not depend upon any particular type.'' As to the type of needle which he extracted from the gum of the plaintiff he said that it was a steel needle of an approved type. ''We never expect needles to break when they are properly inserted, but sometimes they do and that is the history of needles. No careful, competent and skillful dentist would use a needle which he expected to break.''

Dr. E. H. Jacobsmeyer was adduced as a witness by plaintiff. He testified that he had been practicing dentistry for sixteen years, and when shown a needle of the type which had broken off in plaintiff's gum, this witness testified, ''it was a proper type of needle to use under certain circumstances. Its use depends very largely upon the choice of the operator. There are dozens of different kinds of needles and it depends largely upon the particular dentist whether or not he uses a certain type or make or kind of needle.'' This witness further testified that ''all hypodermic needles may break. Any piece of steel is subject to breakage. They do break if skillfully and carefully used and pushed in in the manner that I have described. If such a needle should break it would probably be due to a defective needle or the patient moving or jumping on reaching the bone tissue suddenly, poor temper of the needle—probably any other thing may come up—frightened. If the needle is properly tempered and is put in straight and easily and the patient does not move, I don't know whether or not the needle would break.''

On cross-examination Dr. Jacobsmeyer testified that ''needles do break occasionally in spite of all the care and skill that dentists may possess and use. Needles come from manufacturers and dentists do not make them themselves. There may be a flaw in them that cannot be determined by examination. All kinds of hypodermic needles are more or less fragile by reason of the fact that first, they must be slender in order to be inserted without too much trauma, and, secondly, because they are hollow. . . . I don't suppose that dentists always know the cause of needles breaking. We could not tell after a needle has broken what caused it to break.''

Dr. Poole, the defendant, testified that on plaintiff's first visit he found she had quite an infection in the lower left third molar; that he opened the tooth and took out the filling and told her it was not in condition to extract but would have to wait until the irritation had

subsided; that the tooth was all decayed and the nerve was dead and full of pus; that he realized that it would be a very difficult extraction because the first molar was missing, as that necessitated the use of elevators to extract the tooth; that he told plaintiff to return in a few days; that when plaintiff returned a week later he first cleaned and washed out the tooth, then painted the gum with a solution of iodine to sterilize the surrounding area, and he then took a hypodermic syringe, which had been sterilized by boiling, and proceeded to inject novacaine to block the main nerve, making his insertion where the mandibular opening is; that after that he blocked the buccal side, or the side next to the cheek, and in doing this he used a shorter needle. "I was injecting that as usual and was very much surprised when the needle broke. I was not putting any unusual pressure on it at all. Of course any of them might break at any time. Defendant's Exhibit One is the same make of needle that I used on Mrs. Mitchell;" that he bought the needle from the "Thau-Nolde Company, St. Louis, Missouri," and it was a new needle which he had not used before; that he examined it before he used it and it seemed a normal needle. "I don't know what caused the needle to break unless the muscle contracted or something. You cannot always tell why a needle breaks but they do break occasionally." After the needle broke he decided to remove the tooth, as it was possible to remove the needle after the tooth was out. "I removed the tooth, which was very difficult, and I suppose it took me twenty or twenty-five minutes to get it out. I told Mrs. Mitchell the needle was broken and advised her to have an X-ray taken and I would later remove the needle. I did not want to irritate or cut up gum unnecessarily trying to remove the needle until I was more certain of the location of it. . . . I realized she was going to have quite a bit of trauma and shock from removing that tooth and going to have some trouble with it later and did not think it advisable to add more trouble to it until that irritation subsided from the extraction of that tooth, and that is why I advised her to wait;" that when plaintiff came back the following day she was feeling much better, and there was not much swelling; that he removed the packing from the root socket; that when she came back the next time however plaintiff was suffering more, and it seemed as if the irritation had increased and he redressed it and put a packing in the socket. Dr. Poole stated that he did not find any irritation or infection around the point where the needle had gone into the gum and gave it as his opinion that the presence of the sterile needle in plaintiff's gum would not be likely to cause any infection.

On cross-examination defendant testified he took the needle in question out of a box of new needles, examined it, and found no defect in it; that the needles are polished on the outside and nickle plated; that one cannot tell whether there is any defect inside; that he used

two different needles in making the injection into plaintiff's gum; that the needle which he used for the mandibular injection, which was a conductive injection, was too long for the buccal operation. He gave it as his opinion that any needle will break. ''Some of them will break when least expected, whether carelessly used or not. No one is going to be careless with a hypodermic needle. In inserting them you never know what is going to happen. . . . The needle which broke was down just against the bone. I started to hold it there to force the medicine in when the needle snapped off. I had inserted the needle as far as I wanted it to go. I was holding the hypodermic in my right hand as straight as possible and was holding the cheek away with my left hand. When the needle broke I looked for it for probably a minute. I probed for it with a dull probe just where the needle went in but could not detect it. I also tried to locate it by placing my finger on the gum and moving it along to ascertain whether or not the needle was sticking out of the gum. I could not feel it and told her I would have to have an X-ray to locate the needle.'' Dr. Poole examined part of the needle which plaintiff testified had been extracted from her gum, and after the examination he stated that ''a part of the point . . . is gone. It did have a point when I used it.''

Dr. E. H. Schlueter was adduced by defendant as a witness. He testified that plaintiff was referred to him by Dr. Jones; that he found some infection in the gum where the tooth had been extracted. ''From what I gathered of the history it seems that the infection and swelling was caused by the infection that was present before the tooth was extracted. I irrigated the socket with an antiseptic solution. . . . For the purpose of reducing the infection in the socket.'' The second time plaintiff came in he sent her to have an X-ray picture taken. ''Neither from the examination of the X-ray nor from any other examination or observation I made does it appear that there is any evidence of infection around the immediate site of the needle. The infection was in the socket. I treated Mrs. Mitchell eight times. . . . I did not at any time attempt to remove the needle. I felt that the condition was not far enough progressed to a normal state to try it.''

On cross-examination Dr. Schlueter testified. ''I could see the infection in the socket with my naked eye. It was acute.''

Dr. Harry M. Fisher, a witness for defendant, testified that he had been practicing dentistry for thirty years, and for seventeen years had been a lecturer on anesthesia and extraction at Washington University Dental School; that he confines his practice to the extraction of teeth; that since 1911 he had had between 195,000 and 200,000 patients; that in his practice he necessarily uses hypodermics and also gives general anesthetics. ''I have used dozens of different types of hypodermic needles. There is no single type of needle which is

approved by the profession to the exclusion of other types. The technique a man is using or the case he is using it on determines the type of needle." This witness testified that the type of needle used by defendant "would be a proper type of needle to use in such a case. This type of needle has been used for that purpose for over twenty-five years to my knowledge. I have had experience with needles breaking while using them to insert in patient's gums. I know of no type of needle that will not break. . . . Imperfections cause needles to break. That is a long needle, with a hollow through the center, and it might be very thin at different places, so you would not notice it with the eye." Dr. Fisher further testified that under the facts in the case it would not have been proper to attempt to remove the needle from the gum until after the swelling and infection had subsided because to do so might open up a new field for infection from the infection already there. "It is not possible to tell in advance how long it is going to take for an infection to clear up after a tooth is extracted. Some patients cannot establish resistance to pus infections as quickly as others. Their health may be impaired. In other words, they haven't any come-back and it takes longer. Ten days is an average time for an infection to clear up, but there are exceptions depending on the resistance." Examining the X-ray picture he stated that it showed no infection surrounding the broken needle. "From examining plaintiff's Exhibit D (the part of the needle extracted from plaintiff's gum) and looking at the density toward the end of the needle, I would figure there had been a beveled point on it, but it looks as though at the present time it is eroded and dull. It would be possible for the erosion to take place in the needle while the needle was in the gum." Dr. Fisher was asked the question: "Will needles of whatever type, of whatever substance they are made, break in spite of the fact that the operator may use the highest degree of care and skill that can be used in the dental profession?" His answer was: "Yes, sir."

On cross-examination Dr. Fisher said "erosion is a gradual eating away, and corrosion is more like oxidation. Both of them signify practically the same thing. I have taken needles out of gums that have been in for this length of time and I knew they were bright when they went in and were black when they came out. That is corrosion."

On re-direct examination Dr. Fisher testified that assuming a needle is sterilized and inserted in the gum and broken off, there is not any danger of an infection springing up from the mere presence of that sterile needle, and that he knew this from cases where needles had remained in the gum for some time.

Dr. J. P. Marshall testified as a witness for the defendant; that he had been practicing dentistry for twenty-six years; that he had never heard of any particular hypodermic needle that is used by

the dental profession to the exclusion of other types. He stated he was quite familiar with the type of needle such as the dentist had used on plaintiff in this case. "It is in common use. It would be a proper needle in making an injection and inserting novacaine in the buccal or outer side of the tooth by the infiltration method. . . . Various things cause needles to break. Patients may move at inopportune times or there may be faulty workmanship in the making of the needle. Sometimes needles will break where a dentist possesses and uses the technique of a prudent and skillful dentist practicing in St. Louis County or like communities."

Upon submission of the case the jury returned a verdict for the defendant. The trial court, in sustaining plaintiff's motion for new trial, assigned as grounds therefor three errors specifically set up in said motion. However, upon an appeal from an order granting a new trial the appellate court, in passing upon the action of the trial court in granting plaintiff a new trial, is not limited to a review of the errors assigned by the trial court for granting the new trial, but will consider each of the grounds set up by plaintiff in her motion for new trial. [Cole. v. St. Louis-San Francisco R. Co. (Mo. Sup.), 61 S. W. (2d) 344; State ex rel. Hartman v. Thomas, 245 Mo. 65, 1. c. 75, 149 S. W. 318.]

One of the errors assigned by the trial court as ground for sustaining the motion for new trial is that it erred in overruling plaintiff's oral motion offered at the beginning of the trial to exclude all evidence tending to support the charge in defendant's answer to the effect that the hypodermic needle mentioned in the pleadings was purchased from a reputable manufacturer, and that even with the greatest care and handled with the greatest skill such needles do occasionally break.

The objection urged at the trial was that "it is pleading directly what is known as the simple-tool doctrine, which does not apply in this case and is no defense in the cause of action alleged in plaintiff's petition. . . . It doesn't make any difference what kind of manufacturer he got it from. If it was a bad needle that is all there is to it and it is nothing more than an attempt on the part of the defendant in this case to invoke what is generally known as the simple-tool doctrine. It is no defense to the cause of action stated in plaintiff's petition."

One of the charges of negligence in plaintiff's petition is that the defendant used a hypodermic needle that was "old, worn, weak, unsafe and inadequate," and that the defendant "carelessly and negligently used said hypodermic needle in such an unskillful manner that said hypodermic needle broke." This allegation, together with the admitted fact that dentists do not manufacture the hypodermic needles which they use in their profession, in our view, warrants the defendant in setting up in his answer not only that the needle used

by defendant was an approved hypodermic needle purchased from a reputable manufacturer, but also that it was a needle which to all intents and purposes and so far as any inspection could determine, was a proper hypodermic needle for such use, and that though in administering the novacaine said hypodermic needle broke, it was without any negligence or fault on the part of the defendant, either in the choice or the use of said needle; and that "even with the greatest care and handled with the greatest skill such needles do occasionally break." [Wilt v. McCallum, 214 Mo. App. 321, 253 S. W. 156; Tallman v. Nelson, 141 Mo. App. 478, 125 S. W. 1181.]

Another ground assigned as error, for which the motion for new trial was granted, was that the court erred in giving defendant's instruction numbered six, which reads as follows:

"The court instructs you that all that was required of Dr. Poole in the treatment of plaintiff's case was that he use that degree of care and skill that an ordinarily careful and skillful dentist practicing in St. Louis County or in similar localities would have used under the same or similar circumstances. He would not be guilty of negligence unless he failed to use such care and skill.

"Therefore, if you find and believe from the evidence that in selecting the type of hypodermic needle which he used, and in injecting the same in plaintiff's gum, and in extracting the tooth, and in treating plaintiff thereafter, Dr. Poole used the degree of care and skill above defined, then he is not liable to plaintiff in this case and your verdict must be in favor of the defendant."

It is contended that "the first paragraph of this instruction states an abstract proposition of law, and that the second paragraph simply gives the jury a roving commission to find for the defendant if he possessed and exercised the care and skill of an ordinarily careful and skillful dentist in St. Louis County, or similar localities. This instruction, in effect, limits the skill required of defendant to that skill possessed by practitioners in St. Louis County, in that it stresses St. Louis County; and the words 'or any similar localities' are rendered meaningless."

It is no longer open to question but that under the rule in this State a physician or surgeon, undertaking the treatment of a patient, is required to possess and exercise that degree of skill and learning ordinarily possessed and exercised by the members of his profession in good standing practicing in similar localities. [Krinard v. Westerman, 279 Mo. 680, 216 S. W. 938; Cazzell v. Schofield, 319 Mo. 1169, 8 S. W. (2d) 480.] We note that at plaintiff's request the court gave an instruction which told the jury that it was the defendant's "duty to exercise reasonable skill and care as an ordinarily skillful and careful dentist is accustomed to exercise and use in like treatments and operations under like circumstances."

We rule that upon the record as outlined the giving of defendant's

instruction numbered six was not error prejudicial to plaintiff's rights, and therefore no ground for granting plaintiff a new trial.

Respondent here, plaintiff below, insists however that irrespective of the merits of the alleged errors assigned by the trial court for granting a new trial, that the action of the trial court in granting the new trial was warranted for error in giving instruction numbered eight at the request of defendant. Said instruction reads as follows:

"The court instructs the jury that this case is based upon the alleged negligence of the defendant. In other words, plaintiff charges in substance, that she was injured as a direct result of the negligence of Dr. Poole while under his care as a dentist, and this charge of negligence is defined in other instructions given you.

"Negligence is not to be presumed in this case from the mere fact that the hypodermic needle broke while it was being inserted in plaintiff's gum or from the fact that plaintiff was injured as a direct result thereof. On the contrary, the burden is on plaintiff to prove by a preponderance or the greater weight of the evidence first, that the defendant was negligent in the particulars set out in other instructions given you, and, second, that plaintiff was injured as a direct result of such negligence. Unless these matters have been proved to your reasonable satisfaction by the preponderance or greater weight of the evidence your verdict must be for the defendant."

The contention is that the instruction is erroneous in that it ignores the presumption of negligence from the unusual happening, that is the breaking of the needle in the conduct of an operation entirely under defendant's control and management, and ignores the fact that plaintiff, in her petition, made the general charge of negligence that the defendant negligently and carelessly used said needle in such an unskillful manner that it broke and a part thereof became lodged in the gums and mouth of plaintiff, and ignores the fact that plaintiff charges the defendant with negligence in treating after the extraction.

We must consider this instruction in light of the testimony adduced on behalf of plaintiff and the instructions given at her request.

Dr. E. A. Kitchell, a dentist who treated plaintiff, testified that "there are no needles used in the dental profession which will not break. I could not say they would not break if properly handled in injecting the hypodermic in the jaw." . . . "Needles will break in spite of all the care and skill that a dentist may use." Dr. E. H. Jacobsmeyer, a witness adduced by plaintiff, testified that "all hypodermic needles may break. Any piece of steel is subject to breakage. They do break if carefully and skilfully used, and pushed in in the manner that I have described. If such a needle should break it would probably be due to a defective needle or the patient moving or jumping on reaching the bone tissue very suddenly, poor temper of the needle—probably any other thing may come up—

frightened."' . . . "Needles do break occasionally in spite of all the care and skill that dentists may possess and use. Needles come from manufacturers and dentists do not make them themselves. There may be a flaw in them that cannot be determined by examination. . . . We could not tell after the needle was broken what caused it to break."

Plaintiff's testimony showing that there were several things which could cause a hypodermic needle to break, and that after it had broken it was not possible to tell what caused it to break, and absent any testimony as to what did cause the needle in the present case to break, plaintiff was not entitled to go to the jury upon the theory of *res ipsa loquitur*, for to do so would allow the jury to determine the question of negligence *vel non* of defendant upon pure speculation and conjecture. Furthermore defendant's instruction numbered eight is well in line with the theory which plaintiff submitted to the jury in her instructions, for while plaintiff in her main instruction, which covered the entire case and directed a verdict, predicated a recovery upon a finding that (1) defendant negligently treated plaintiff in the extraction and drawing of plaintiff's tooth, (2) or that the defendant negligently used a hypodermic needle which was unsafe, and that the needle broke and a part thereof became and remained and lodged in the gum of the plaintiff, (3) or that defendant negligently used a hypodermic needle so as to cause the same to break and a part remain in her gum, yet in a separate instruction given at plaintiff's request the jury were told that the terms "careless" and "negligent" as used in the instruction did not imply a lack of skill or capacity, but simply a disregard of ordinary prudence, and that although they may have believed the defendant to have possessed all the qualifications necessary to a competent and skillful dentist, "yet if it has been proven by the evidence that he was careless and negligent in treating and extracting plaintiff's said tooth *in either of the particulars set forth in said instruction numbered one,*" and that through such negligence the plaintiff was injured, then the mere fact that the defendant may have been competent and careful constitutes no defense to the action.

Defendant, upon the pleadings and testimony adduced, was clearly entitled to the said instruction numbered eight.

The case, in our view, was well tried and the instructions presented plaintiff's case to the jury more favorably than she was entitled to upon the record. We find no error prejudicial to the plaintiff's case, and the judgment is for the right party. The court's order granting plaintiff a new trial was improvidently made and should be set aside. The judgment is reversed and the cause remanded. *McCullen, J.,* concurs; *Hostetter, P. J.,* not sitting.