JOHN J. COX v. MISSOURI-KANSAS-TEXAS RAILROAD COMPANY, Appellant.—76 S. W. (2d) 411.

Division One, November 16, 1934.

*Carl S. Hoffman* and *Everett Paul Griffin* for appellant.

*Allen, Moser & Marsalek* for respondent.

1228

STURGIS, C.—The defendant, as its name indicates, is an interstate railroad company and engaged in interstate commerce. It has connected lines of railroad in Texas, Oklahoma, Kansas, and Missouri, with its eastern terminus at St. Louis, where it connects with a large number of eastern lines. The plaintiff, a machinist in defendant's employ, brought this suit for personal injuries which he claims to have received in the course of his work at Franklin, Missouri, a division point on defendant's main line of road some 200 miles west of St. Louis and 40 miles northeast of Sedalia, Missouri.

The defendant maintained a roundhouse and repair shop at Franklin, Missouri, where its engines and other railroad equipment were

repaired and conditioned for further use, and plaintiff was employed in that line of work. About September 1, 1925, the plaintiff claims to have received the injuries in question while assisting one Brown, also a machinist in defendant's employ, in repairing a passenger engine used by defendant in operating one of its regular passenger trains between Sedalia, Missouri, and St. Charles, Missouri, a point some 25 miles northwest of St. Louis. The injury is alleged to have occurred by reason of the fellow machinist Brown negligently striking plaintiff's left hand with a sledge hammer which Brown was wielding in driving an iron wedge against which plaintiff was holding a punch, in the course of making the engine repairs. According to plaintiff's evidence, the machinist Brown struck the punch which plaintiff was holding what plaintiff says was a glancing blow which, by glancing, also struck plaintiff's left hand. This negligent blow of the sledge hammer itself caused only a slight injury to plaintiff's hand, but plaintiff claims that in the course of a year or so such slight injury developed into a cancer of the hand, necessitating the left arm being amputated between the wrist and elbow. It is for the loss of his hand that plaintiff brought this suit and on a jury trial recovered a verdict for $20,000 damages, which the trial court caused plaintiff to reduce by *remittitur* to $17,000, for which judgment was entered. The defendant has appealed.

The defendant by its answer denied that plaintiff received any injuries at the time, in the manner or by the means stated, and further alleges that at the times mentioned in plaintiff's petition it was operating an interstate railroad and engaged in interstate commerce; that the locomotive engine on which plaintiff was working was assigned to and engaged in the transportation of persons and property in interstate commerce and that plaintiff's cause of action, if any, is covered exclusively by the Act of Congress known as the Federal Employers' Liability Act, 36 United States Statutes at Large, Chapter 143, which provides that ''No action shall be maintained under this chapter unless commenced within two years from the day the cause of action accrued;'' that plaintiff did not within two years after the accrual of his cause of action commence this or any suit on such cause of action, and that this and any cause of action growing out of or based on the facts alleged in the petition is barred by the aforesaid Statute of Limitation contained in the Act of Congress. The plaintiff does not claim that he brought any suit on the present cause of action within the two years after the same accrued to him, but by his reply denies that the injuries sued for were connected with or grew out of interstate commerce so as to be governed exclusively by the Federal act mentioned, and therefore that the two-year Statute of Limitation contained in the Federal act is not applicable.

1230

■ There is no doubt but that the Congress of the United States has occupied the whole field of interstate commerce and if the injuries to plaintiff for which he sues were received while he and the defendant were engaged in commerce between the states, then plaintiff's cause of action is governed exclusively by the Federal act and is barred by the limitations therein provided. [45 U. S. Code Anno., sec. 56.] In Milburn v. Chicago, M., St. P. & P. Railroad Co., 331 Mo. 1171, 56 S. W. (2d) 80, 86, this court ruled: "If the employee is not engaged in commerce 'among the several states,' Congress has no authority to legislate concerning his rights and remedies for injuries sustained. [Article 1, Sec. 8, Clause 3, Constitution of the United States.] Likewise, if he is so engaged, since the entire subject of injuries in interstate commerce is so completely covered by Federal acts, the states cannot make any provisions concerning them regardless of whether or not Congress has provided liability for every injury. [New York Cent. Railroad Co. v. Winfield, 244 U. S. 147, 37 Sup. Ct. 546, 61 L. Ed. 1045, L. R. A. 1918C, 439, Ann. Cas. 1917 D, 1139.]" If the Federal act applies, this action is barred. [Atlantic Coast Line Railroad Co. v. Burnette, 239 U. S. 199, 60 L. Ed. 226; Reading Co. v. Koons, 271 U. S. 58, 70 L. Ed. 835; Flynn v. New York, N. H. & H. Railroad Co., 283 U. S. 53, 75 L. Ed. 837.]

The defendant interposed a demurrer to the evidence and now insists that the same should have been sustained for the reason that the evidence as a whole conclusively shows that the cause of action sued on is governed by the Federal Employers' Liability Act pertaining to injuries received in connection with interstate transportation and is barred by the special Statute of Limitation of two years therein contained. If defendant's contention in this respect must be upheld, then it disposes of the whole case in defendant's favor and we need not even examine the other errors assigned on this appeal.

■ Touching this question of interstate commerce, we will first grant that plaintiff made a prima facie case in his favor as to his injuries and defendant's negligence causing same. We also concede that the prima facie case in plaintiff's favor was made by plaintiff's own evidence given on his direct examination, supplemented by other evidence as to his injuries and defendant's negligence, without any reference to plaintiff and defendant being at the time engaged in interstate commerce. It is also true that the fact of plaintiff and defendant being at the time engaged in interstate commerce so as to make the Federal Employers' Liability Act applicable was an affirmative defense asserted by defendant in its answer and as to which the burden of proof rested on defendant. However, the plaintiff was cross-examined as to the facts relating to the business in which he and defendant were engaged at the time of his injury and as to the train and engine movements in that connection as bearing

on the question of his being engaged in interstate commerce; and if his statements and admissions, when taken in connection with the undisputed facts established by defendant's unquestioned evidence, show without reasonable doubt that plaintiff and defendant were at the time engaged in interstate commerce, then we think plaintiff's prima facie case is not exactly nullified but rather removed from the realm of intrastate commerce to that of interstate commerce with its conditions and restrictions.

Plaintiff, after testifying that he was in defendant's employ as a machinist at Franklin, Missouri, and that on the day in question he was called by machinist Brown, also an employee who was doing repair work on a locomotive engine standing in defendant's yards, to assist him temporarily in making such repairs, and that while doing so he was holding a punch against a wedge which machinist Brown struck upward with a sledge hammer which glanced and struck his hand, further testified:

"The engine Brown was working on was one of the little eight-wheel passenger engines which were at that time being used on runs 9 and 10. This engine came in in the morning and was going out that evening. I did not see it go out but that is the run it was on. I didn't say at the other trial that I saw it go out that evening but said it was supposed to go out. Brown was working on running repairs and I was called to assist him. We work on engines that come in in the morning and go out in the evening provided we finish the work. We were doing what is termed running repairs on this engine. It was not a dead engine. This engine was attached to a passenger coach—it always pulls two coaches. I don't know what was in these coaches. Trains 9 and 10 ran from Sedalia to St. Charles for a time, but I don't know when they changed runs. 'I am not on to the train rules or sheets.' This train ran to Sedalia. This engine made a few trips on runs 9 and 10 but I don't know whether that engine was assigned to that run. I said at the trial in May, 1930, that 'that engine went out on the run that night.' I did not see it go out but the engineer who was on that run boarded at the same place I did and he made the remark when the engine came back the next day that the boy did a good job on that engine. 'Q. Isn't it a fact that the engine did go out that night? A. Well, the engineer that was supposed to be on that run came in the next day and said the boys done a good job on his engine.' As to knowing it came in off that run that morning (the accident occurred about noon), I didn't see it come in, but according to the engineer's ticket why he must have come in that morning. I know the difference between running repairs and classified repairs and this was an engine that was in there for running repairs, which means that it came in off the run in the morning for minor repairs and would go out in the evening if the repairs were finished. I know that that engine

was out of the shop that night. I know that of my own knowledge, but I never saw her go out on the road. I said that engine was attached to runs 9 and 10, but I didn't say it was assigned to that run. I said it was used on the 9 and 10 run. The day Brown made these repairs on this engine she certainly must have come in on run 10 that morning or the engineer would not have reported it. She came in that morning he made report on her and she was out of the shop that evening. That was a running repair.''

It is evidence that plaintiff was cautious if not reluctant to state facts not within his personal observation, though such facts were really within his knowledge. Some facts which are perfectly obvious the witness declined to confirm because not within the actual range of his vision.

The defendant then called as a witness F. P. Stocker, who was trainmaster of defendant in August and September, 1925, when the accident in question occurred, and who had charge of the operation of trains and the men operating same in that territory. His evidence is in no way contradictory of that of plaintiff but supplements and enlarges same by making it more definite and certain in some particulars. He testified:

He was familiar with runs 9 and 10 on defendant's railroad which were regular daily runs at that time between Sedalia and St. Charles, passing through Franklin, where the defendant's repair shops and roundhouse were located. It is about 250 miles from Sedalia to St. Louis—about 40 miles from Sedalia to Franklin, and 185 miles from Franklin to St. Charles, and about 30 miles from St. Charles to St. Louis. Passenger run No. 10 was from Sedalia to St. Charles and Run No. 9 was from St. Charles to Sedalia. On these runs were short passenger trains consisting of the engine, a baggage and mail car, and generally two coaches. They were local trains stopping at all stations. These trains were pulled by small passenger engines, there being three and only three such engines assigned to these runs. The three small engines assigned to these runs went into the shops at Franklin for running repairs and being conditioned for further use. These two runs were being maintained daily the last week in August and the first week in September, 1925, when this injury occurred. The trains on these runs carried passengers, express, baggage and parcel post mail. All parcel post mail originating at Chicago, New York, and all eastern points destined to all local stations between St. Charles and Sedalia was carried on train No. 9, and the same was true of express, baggage and passengers. A mail and baggage car was made up at St. Louis into which was placed the parcel post mail, express, and baggage coming into St. Louis from points beyond and destined for local points between St. Louis and Sedalia, which car was hauled from St. Louis to St. Charles on a through train No. 3 destined for points in Kansas.

Oklahoma and Texas, and transferred at St. Charles to train 9, of which it became a part. Passengers from points beyond St. Louis going to points between St. Charles and Sedalia were likewise transferred at St. Charles to this local train No. 9 and carried to their destination. The reverse of this was true of train No. 10 starting from Sedalia and receiving there passengers, express, baggage and parcel post mail destined to local points in states beyond St. Louis. This witness said he traveled on these trains frequently, had supervision of the same, and observed and was familiar with the business handled and knew that a large part of it originated in other states than Missouri and was transferred and delivered in this State or originated in this State and was delivered to points in other states.

It is clear, we think, that trains 9 and 10 and the engines operating the same were engaged in interstate commerce. The rule laid down in Gannon v. Laclede Gaslight Co., 145 Mo. 502, 46 S. W. 968, that the jury has a right to reject and disbelieve the uncontradicted verbal evidence of a defendant, has no application here.

The plaintiff was not able to fix the time of his injury further than to say it was within a period of time covered by the last three days of August and first three days of September, 1925. All that he could say was that on whichever day it occurred he was assisting machinist Brown in making running repairs on one of the three small passenger engines used on runs 9 and 10 and that such engine came in on No. 10 that morning from Sedalia and went out that same evening. Train No. 10 came from Sedalia, leaving there at about 6:00 o'clock A. M., and arrived at Franklin at 7:45 A. M. Train No. 9 came into Franklin from St. Charles in the evening and went on to Sedalia that same evening. Plaintiff was injured about noon. The three engines assigned to these runs were used as near as possible alternately and changed at Franklin for repairs and being conditioned. When train No. 10, starting at Sedalia at 6:00 o'clock A. M., reached Franklin at 7:45 A. M., the engine pulling same was detached and taken into the yards and shops for repairs and being conditioned and another of the three engines hauled the train No. 10 to St. Charles and then hauled train No. 9 back to Franklin that same evening, where it again went into the shops, and the third engine took the train on to Sedalia, returning to Franklin the next morning and going into the shops. This routine was repeated so that defendant always had one engine ready for service in reserve in case of an emergency. As machinist Brown denied that any such accident occurred as testified to by plaintiff, and as plaintiff continued his work regularly for a long time after his claimed injury without reporting the accident and his injury to anyone connected with defendant, the defendant had no means of knowing or tracing which one of the three engines came in from Sedalia on train No. 10 on the particular date of plaintiff's injury or on what run such engine

was next used. We think, however, that the evidence clearly shows that the engine, in repairing which plaintiff was injured, if at all, hauled train No. 10 from Sedalia to Franklin on the morning of the day of the accident and was set out in defendant's yards and shops at Franklin for running repairs, in the making of which plaintiff was injured, and was then put back in use on either runs 9 or 10. If trains 9 and 10 were engaged in interstate transportation of persons and property, and the undisputed evidence shows they were, then the engine in question was merely temporarily diverted from its regular use for the purpose of making running repairs and reconditioning the engine to be returned and continued in such commerce. Doing this did not withdraw the engine from its use in interstate commerce or break the continuity of such use. [Oglesby v. St. Louis-San Francisco Ry. Co., 318 Mo. 79, 1 S. W. (2d) 172, 174.] We cannot agree with plaintiff's contention that there was no showing whatever that the engine in question had been used on either of the runs 9 or 10 immediately before it entered the roundhouse for running repairs on this occasion or that it was returned to such service in one of such runs after the repairs were completed. As plaintiff did not know or designate the date of his injury, defendant could hardly be expected to produce its records, as plaintiff insists it should have done, showing which one of these three engines assigned to runs 9 and 10 was actually in use on either run on the particular day of his injury.

Plaintiff insists that it is not shown that the identical train No. 9 or 10 which this engine moved immediately before it was detached and put in the repair shops or the train which it moved after the running repairs were completed, was carrying interstate traffic. It is not to be expected, however, that defendant kept a record of the particular passengers, express packages, pieces of baggage or parcel post mail carried on each particular train of runs 9 and 10, and if it did so, in the absence of any definite date of the injury, it would not know which day's record to produce. We hold that the evidence is sufficiently specific and definite in this respect. [Lehigh Valley Railroad Co. v. Huben, 10 Fed. (2d) 78.] In this case it was held, quoting the headnote: "Evidence held to show baggage master on train was engaged in interstate commerce. Evidence that mails for points without the State were nearly always carried on train on which baggage master was working at time of his death, and lack of affirmative showing to the contrary, held to show as a matter of law that decedent was engaged in interstate commerce."

It follows from these conclusions that plaintiff's cause of action is governed by the Act of Congress known as the Federal Employers' Liability Act and that same is barred by the Statute of Limitation therein contained.

■ The judgment herein should also be reversed for failure of the evidence to show that the loss of plaintiff's left hand was the result of the injury to such hand by reason of its being struck by the sledge hammer wielded by machinist Brown. The immediate result of such blow was a wound or bruise on the back of plaintiff's hand about an inch long, breaking the skin but not severe enough to cause plaintiff to cease his regular work even temporarily. The wound, however, did not entirely heal but it was a year or more before it was ascertained that a cancer was forming or becoming malignant on this hand. It was the cancer which necessitated the amputation of the hand or rather the arm between the wrist and elbow. The serious question is whether the cancer was caused by and resulted from the injury inflicted by the hammer striking the plaintiff's hand on the occasion in question or was caused by other previous injuries to plaintiff's same hand, which previous injuries plaintiff admitted, or from some natural or unknown cause. This question can be determined only from the medical evidence. Such evidence was to the effect that the basic cause of cancer is unknown but that cancer may and does at times result from trauma or external violence but more often from natural or unknown causes. Without going into detail here, it will suffice to say that no physician or surgeon who treated plaintiff for this cancer, nor the surgeon who amputated the arm, testified for plaintiff or gave evidence to support his claim that the cancer which developed on the hand was caused by or resulted from the particular injury in question. Being called by defendant, their evidence was to the contrary. A single expert witness, who had never treated plaintiff's injury or seen same before the arm was amputated, testified for plaintiff and his evidence in answer to a hypothetical question based on plaintiff's evidence as to the facts connected with his injury went no further than that the cancer in question might or could have resulted from the hammer injury in question. The cancer on plaintiff's hand was not the natural or usual result of the injury caused by striking with the hammer, and it is a settled rule of this court that in such a case it is necessary for plaintiff to show a causal connection between the injury and the cancer, and it is not sufficient for this purpose to merely show that such injury to the hand might or could have caused the subsequent cancer. There is not, therefore, sufficient evidence in the record to sustain the jury's verdict for the loss of plaintiff's hand and any other verdict would be merely nominal. [O'Leary v. Scullin Steel Co., 303 Mo. 363, 260 S. W. 55.] In Kimmie v. Terminal Railroad Assn., 334 Mo. 596, 66 S. W. (2d) 561, it was claimed that a fall on the end of a tie by reason of a defective engine step caused a cancer to develop later. There, as here, the only evidence as to the causal connection between the fall and the cancer was that of a medical expert who testified that such fall "might, could, or would"

cause the cancer. This court said: "It (cancer) was certainly an unusual and not an ordinary or natural result of such a fall. No layman could know or have any reasonable basis for an inference that it did result from it. The opinion of the doctors that it might, could, or would result from the fall is no more than an assurance that such a result was scientifically possible. [Edmondson v. Hotels Statler Co., 306 Mo. 216, 267 S. W. 612; Meyers v. Wells (Mo.), 273 S. W. 110; Mueller v. St. Louis Pub. Serv. Co. (Mo. App.), 44 S. W. (2d) 875, and cases cited.] It was not substantial evidence that it did result from it and there was not here other ample evidence, 'tending to exclude all other causes save the fall and to prove that the fall was the cause,' as in those cases. No other evidence of the doctors went further than to show possibility. They admitted that the causes of cancer are usually unknown." And at page 565 it was further said: "Considered in the light most favorable to plaintiff, this evidence was too insubstantial and uncertain to justify finding that the fall caused the tumor. It left the whole matter to speculation and conjecture. [See, also, Plank v. R. J. Brown Petroleum Co., 332 Mo. 1150, 61 S. W. (2d) 328; Bante v. Wells (Mo. App.), 34 S. W. (2d) 980, and cases cited.] . . . It would seem that the evidence here is too indefinite and uncertain to meet the required test, but leaves it all in the realm of speculation." In Adelsberger v. Sheehy, 332 Mo. 954, 59 S. W. (2d) 644, 646, plaintiff received direct injury, though not very severe, from external violence and later a bad condition of the heart developed. A medical expert testified that the bad condition of the heart could have been caused by the injury received, but this court held that such evidence was not sufficient to make a case for the jury, and said: "If the heart condition was caused by ravages of the disease, defendant is not liable therefor. The burden was on the plaintiff to show the cause. Evidence that the condition might or could have been caused by either injury or disease without any substantial showing as to which of the possible causes did produce the condition, furnishes no basis from which a jury could determine the cause. [O'Leary v. Scullin Steel Co., 303 Mo. 363, 375, 260 S. W. 55.]" Tested by the rule announced in this and the other cases cited, the evidence is not sufficient to sustain the verdict.

Plaintiff contends, however, that defendant is estopped to claim that this expert witness did not testify that in his opinion the blow of the hammer did in fact cause the cancer. It is true that after plaintiff's expert had testified that such result could be the cause, he was asked on the same hypothetical facts if he thought the cancer was caused by the hammer blow. Had defendant objected to the competency or materiality of this evidence and induced the court to sustain the objection, there would be much force in plaintiff's contention. [Paul v. Western Union Tel. Co., 164 Mo. App. 233,

145 S. W. 99; Minor v. Woodward, 179 Mo. App. 333, 336, 166 S. W. 855.] However, the objection made in the present case was that the witness was not qualified as an expert and that he had already answered the question by repeatedly saying that all he could say was that the cancer *could* follow the injury. Regardless of whether the court was correct in refusing to allow the witness to answer for the reasons assigned in the objection, the fact remains that the witness did not answer in the affirmative, and the only evidence in the record is that in the opinion of the expert the cancer might or could have so resulted. That is not sufficient to warrant the jury in finding that it did so result. Possibly the witness would have answered in the affirmative, though his previous evidence indicated that he would have answered in the negative. Plaintiff made no offer of proof by the witness and we cannot assume that the witness would have answered affirmatively. The defendant certainly had a right to object to the competency of the witness as an expert and to insist that the witness had already fully answered the question in the negative and could not be allowed to change his answer, and even if the court erroneously sustained defendant's objection, that does not supply the lack of affirmative evidence to support the verdict either by estoppel or otherwise.

The result is that the judgment of the trial court must be and is reversed. *Ferguson* and *Hyde,* CC., concur.

PER CURIAM:—The foregoing opinion by STURGIS, C., is adopted as the opinion of the court. All the judges concur.