**Lennie KANE, Administratrix of the Estate of Charles Kane, Deceased, Appellant,**

v.

**CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, a Corporation, Respondent.**

**No. 43875.**

Supreme Court of Missouri.

Division No. 2.

Sept. 13, 1954.

Rehearing Denied Oct. 11, 1954.

Jay L. Oldham, Kansas City, for appellant.

H. M. Langworthy, Clyde J. Linde, Robert B. Langworthy, Kansas City, for respondent, Langworthy, Matz & Linde, Kansas City, of counsel.

BROADDUS, Special Judge.

This is an action for damages under the Federal Employers' Liability Act, 45 U.S.

C.A. § 51 et seq., alleged to have been sustained by plaintiff, Lennie Kane, as administratrix of the estate of her deceased husband, Charles Kane, as a result of the death of said Charles Kane, allegedly caused by occurrences on February 12, 1947 and April 7, 1947.

The fifth amended petition upon which the case was tried charged that negligence on the part of defendant caused plaintiff's husband, while on duty on February 12, 1947, as a chef cook on a dining car of defendant, to be thrown against a work table and suffer a hernia, and further charged that on April 7, 1947, while on duty on defendant's dining car, deceased became violently·ill as a result of said hernia, and that said illness was fatal because of the negligent delay of defendant in securing medical assistance for the deceased.

The trial below resulted in a directed verdict for defendant, and after plaintiff's motion for new trial was overruled, she appealed to this court.

Briefly, the evidence was as follows: On February 12, 1947, the deceased, Charles Kane, was a chef cook for defendant employed in its dining car on a train westbound from St. Louis to Kansas City. The only evidence with reference to whether or not deceased suffered an injury on that date was the testimony of the witness, Charles Mathews, who was employed on the same dining car on that day. His testimony was that he was in the pantry of the dining car, preparing vegetables and cleaning up and getting ready for dinner; that deceased was in the kitchen of the dining car standing near the serving board. This board separated the kitchen from the pantry. It was "approximately three or three and a quarter feet" higher than the floor of the car. The witness stated that after the train passed Marshall, but before it reached Higginsville, he "noticed Mr. Kane leaning upon the board. Then he called to me and asked me to go get the waiter in charge." The Court then asked: "Did you see him fall?

"The witness: I didn't see him directly fall, your Honor.

"The Court: You don't know what happened?

"The witness: The only thing I saw—

"The Court: Did you know what happened to him by having seen it?

"The witness: .Well, I wouldn't know exactly what happened to him.

"The Court: Did you see anything happen to him?

"The witness: No, I didn't see that.

"The Court: Did you see anything happen to the car?

"The witness: Well, the swaying, I saw the train sway. It sways back and forth all the time just like this (indicating), going around those curves. It happened that way, that particular evening.

"The Court: Did it happen that way all the time, you say?

"The witness: Yes.

"The Court: At that point?

"The witness: There and at other points." (The negligence charged in the petition was that defendant caused "said dining car to make an unusual, violent and sudden jerk.")

The witness further testified that he went out and called the head waiter. The latter came into the kitchen and talked to deceased. Then the two sat down at one of the tables in the dining car and filled out some kind of report.

Plaintiff testified that deceased arrived home on the night of February 12th. The next morning she went with him to the office of Dr. E. P. Heller, the company's doctor. She saw Dr. Heller examine deceased for "injury to his stomach—it was a little knot that laid about here on the left side, about the end of my finger (indicating), I would say." After leaving the doctor's office deceased purchased and began to wear a truss. Deceased continued to work, except for his regular relief period, from that time until the date of his death on April 7, 1947.

Early in the morning of April 7, 1947, deceased boarded one of defendant's dining

cars at St. Joseph, Missouri, which car was shortly thereafter to be attached to a train bound for Kansas City, Missouri. Soon after deceased boarded the car, he was found vomiting into a garbage can. His fellow employees took him back into the ladies' rest room on the dining car and continued to look in on him from time to time and he was seen to continue vomiting. Soon after the car was attached to the train and left St. Joseph, the waiter in charge put a telegram off the train (directed to defendant's agent at Kansas City) to have the train met with a doctor and a wheel chair, and stating that Chef Cook Kane was ill. This telegram did not reach defendant's agent in Kansas City until five or ten minutes before the train arrived. Deceased continued to vomit, and his fellow employees obtained the services of a passenger doctor who examined him. Upon arrival in Kansas City, he was taken to the Union Station emergency room by defendant's passenger agent, assisted by station porters and by deceased's fellow employees, and was there placed in bed. Defendant's passenger agent had telephoned Dr. Heller, who was deceased at the time of the trial. Dr. Heller arrived about two hours after deceased arrived and immediately directed him to be sent to Wheatley Hospital, after first attempting to give him some medication which he was unable to do because of lack of equipment at the Union Station emergency room. Deceased died approximately five minutes after arriving at Wheatley Hospital. He had continued to vomit intermittently during all the time he was in the emergency room at the Union Station.

Plaintiff produced no medical evidence whatsoever tending to show the cause of the death of deceased nor in any way tending to connect it with his alleged injury of February 12th, or the claimed failure to render him prompt medical treatment on April 7th. Defendant offered the only medical evidence in the case. This evidence was that deceased died of cardiac enlargement and endocarditis, due to chronic nephritis, with no evidence or indication whatsoever that the death was due to injury or in any way connected with the alleged hernia.

It will be apparent from what follows that we need not discuss the question of whether plaintiff offered any evidence tending to show negligence on the part of defendant in the operation of the train.

The following remarks made to the jury by the learned trial court at the time it sustained defendant's motion for a directed verdict indicate clearly the basis for the court's action.

"Gentlemen, you will be discharged from further consideration of this case. Thank you for your patience. It has been a very troublesome case under the law and the evidence, and *it is necessary for the plaintiff to prove that this fall 54 days before produced a hernia that caused the death. The Court doesn't find any evidence which proves that.*

"On the other count of careless treatment, *it was necessary to prove that the failure to give proper treatment caused his death, and there is no evidence that would justify such finding.* Nobody would know whether there is anything that could have been done for this man under the evidence. We have to be governed by what evidence there is here, and there has to be evidence on which a court can decide a case. The internal hemorrhage of some kind, there has been no expert testimony here to say what caused that internal hemorrhage and no factual evidence except that he did have an internal hemorrhage. What could have been done to save him? Unless there is something that could have been done to save him, you can't find the defendant guilty of not saving his life. Nobody but God could determine, as they say in some of these cases, what could have been done, so that you can't find that the failure to do something there cost him his life. I am just making that explanation to you because it has all developed into a question of law as to whether there is enough evidence to go to the jury on. The court finds there isn't." (Emphasis ours.)

In our opinion, under the evidence, the action of the trial court was correct. The kind of injury deceased received on February 12, 1947 would not naturally and normally result in his death. No layman could know or have any reasonable basis for an inference that it did result from it. Any such inference by a layman would be but mere guess, conjecture or speculation. The following quotation from the leading case of O'Leary v. Scullin Steel Co., 303 Mo. 363, 381, 260 S.W. 55, 61, fits the case at bar: "In the instant case the jury cannot, without expert testimony, get at the cause from the other evidence, because the evidence has no tendency to prove to the lay mind a relation of cause and effect." And this court discussing expert medical testimony in the case of Spencer v. Quincy, O. & K. C. Railroad Co., 317 Mo. 492, 503, 297 S.W. 353, 357, said: "Sometimes it is the *only evidence* by which proof can be made." (Citing the O'Leary case.) From plaintiff's standpoint the instant case lacks that kind of evidence. Other cases announcing the same rule are Kimmie v. Terminal R. R. Ass'n, 334 Mo. 596, 66 S.W.2d 561; and Cox v. Missouri-Kansas-Texas Railroad Co., 335 Mo. 1226, 76 S.W.2d 411.

Furthermore the rule announced in the case of Pedigo v. Roseberry, 340 Mo. 724, 102 S.W.2d 600, 608 is applicable to the instant case. As we have stated, there was undisputed evidence on the part of the defendant that the death was caused by a heart condition and other pre-existing conditions. We quote the following from the Pedigo opinion:

"The mere fact that injury follows negligence does not necessarily create liability. The burden of establishing by substantial evidence appellants' negligence as charged and the necessary causal connection between such negligence and the injury alleged rested upon respondent. And, if the evidence merely established that the injury might have resulted from several causes for some but not all of which appellants were liable, the necessary causal connection remained in the realm of con-

jecture and speculation and respondent's case failed. State ex rel. City of St. Charles v. Haid, 325 Mo. 107, 118 (2), 28 S.W.2d 97, 102(5), and cases cited; Nevinger v. Haun, 197 Mo.App. 416, 428, 196 S.W. 39, 42(5); Mitchell v. Poole, 229 Mo.App. 1, 15, 68 S.W. 2d 833, 839(6); see, also, Grindstaff v. J. Goldberg, etc., Co., 328 Mo. 72, 79, 80, 40 S.W.2d 702, 705(6, 8)."

To sustain her claim that defendant is liable to her because of its alleged failure to render prompt medical treatment to deceased plaintiff relies upon the case of Hunicke v. Meramec Quarry Co., 262 Mo. 560, 172 S.W. 43, 55, L.R.A.1915C, 789. That case lays down the rule "that, just as soon as an injury of this character occurs, it then becomes the duty of the master to furnish medical treatment, and if he neglects to use reasonable efforts to do so, *and the evidence shows that in all reasonable probability that failure was the proximate cause of the death,* then the defendant is liable."

And at pages 584 and 585 of 262 Mo., at pages 50 and 51 of 172 S.W. of that opinion this language appears: "In the statement of the case we have set out much of the evidence tending to show the negligence of the defendant in not procuring surgical treatment for Hunicke more promptly; *and that he would not have died had he received prompt treatment.* * * * In other words we are of the opinion that the evidence tended to show that the company was guilty of negligence in not using more diligence in procuring medical and surgical treatment for this party; *also that it tended to show that said negligence was the proximate cause of his death."* (Emphasis supplied.)

In the instant case there is no evidence whatever tending to show that the alleged failure of defendant to more promptly furnish medical aid to deceased was the proximate cause of his death. Thus the holding in the Hunicke case does not aid plaintiff.

The judgment is affirmed.

ANDERSON, Special Judge, and LEEDY, Acting P. J., concur.