ANNA NAY BERRY, by Her Next Friend, M. T. NAY, v. KANSAS CITY PUBLIC SERVICE COMPANY, a Corporation, and JAMES M. KURN and JOHN G. LONSDALE, Trustees of and for ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, a Corporation, Appellants.— 108 S. W. (2d) 98.

Division One, July 30, 1937.

660

*Joseph W. Jamison, Henry S. Conrad, L. E. Durham, Hale Houts* and *Ilus M. Lee* for James M. Kurn and John G. Lonsdale, Trustees of and for St. Louis-San Francisco Railway Company.

*Charles L. Carr* and *Watson, Ess, Groner, Barnett & Whittaker,* for Kansas City Public Service Company.

*Jenkins & Vance* and *Musser, Musser & Cooper* for respondent.

664

FERGUSON, C.—This is an action for damages for personal injuries. Plaintiff, a young lady eighteen years of age at the time, was injured, on October 22, 1933, when a street car of the defendant Kansas City Public Service Company, upon which she was a passenger, and a freight train of the defendant St. Louis-San Francisco Railway Company collided at a crossing of the street car and railroad tracks "in the Sheffield district in the east part of Kansas City." Plaintiff, by next friend, brought this action against both the Kansas City Public Service Company (hereafter referred to as the Public Service Company) and the Trustees of the St. Louis-San Francisco Railway Company, a corporation (hereafter referred to both as the Frisco and the Railway Company). The cause was instituted and tried in the Circuit Court of Johnson County and plaintiff had verdict, and judgment thereon, against both defendants, for damages in the amount of $20,000. Defendants have separately appealed.

We are not called upon to rule a demurrer to the evidence and a condensed statement of the facts will be sufficient to present the issues involved. At this crossing two east and west street car tracks (an eastbound and a westbound track) cross a single north and south Frisco railroad track. The crossing is not in a street intersection and the railroad tracks are not upon and do not cross any street or road at this point. The street car was westbound and traveling on the north street car track. The freight train composed of an engine and tender, 22 freight cars and a caboose, was northbound. These east and west street car tracks also crossed north and south tracks of the Missouri Pacific Railway 187 feet east of this Frisco crossing. As will presently appear Section 4896, Revised Statutes 1929, was invoked in this case. That section reads: "It shall be the duty of every street railway company or corporation operating a street railway across the tracks of a railroad company to bring its cars to a full stop at least ten and not more than twenty feet before reaching the tracks of the railroad company. And it

shall be the duty of the conductor, or some other employee of the street railway company, to go forward to the tracks of such railroad company for the purpose of ascertaining whether a train is approaching such crossing." The Public Service Company had a large sign board at the right or north of its westbound track, and about twenty-two feet east of the Frisco track, upon which was painted in large lettering, "Stop—Railroad Crossing—Be sure you have clear track before crossing." It is admitted that this warning or demand was directed to the operators of its westbound street cars. The street car was in charge of one man who both collected fare and operated the car. The collision occurred in the nighttime at about one o'clock A. M., October 22, 1933. Accompanied by her cousin Ruby Snow, plaintiff boarded this westbound car at Fairmount Station. At the time plaintiff had a room on Prospect Street in Kansas City. She had been visiting her sister at Fairmount and was returning to her room. Plaintiff testified that the street car did not stop at the crossing of the Missouri Pacific tracks and continued west at about the "usual speed" of a street car and without any checking or slackening of speed onto the Frisco track where it was struck by the engine of the northbound Frisco train. She said the operator did not stop the car before going upon the Frisco track. The Frisco engineer stated that he saw the street car approaching the crossing when it was yet about seventy-five feet east of the Frisco track and that it did not stop before going onto the Frisco track. The Public Service Company employed a watchman at this crossing during the daytime and until midnight in the nighttime. Both the operator of the street car and the trainmen knew there was no watchman on duty at this time of night. The evidence was that street cars customarily stopped before going onto the crossing. The Frisco engineer testified that he had "run trains over that line since 1918" and had never before observed a street car fail to stop before crossing the railroad track. The operator of the street car testified he brought the car to a full and complete stop with the front or west end of the car about six or eight feet east of the railroad track from which point he could see the headlight, if lighted, of a locomotive approaching from either the north or south; that the car was stopped and stood at this point for about ten seconds; that he looked both north and south for a train; that he heard no whistle or bell and saw no headlight and thereupon he started the car, had attained a speed of about five miles an hour and that the car, which was forty-eight feet in length, had gotten about "two-thirds" over the crossing when it was struck by the Frisco engine. A Mr. and Mrs. Gillmore testified they saw the collision. Mr. Gillmore was called as a witness by plaintiff and Mrs. Gillmore by defendant Public Service Company. Both said that before going onto the rail-

road track the street car was brought to a full stop a short distance east of the railroad track. Plaintiff and defendant Public Service Company adduced evidence that as the Frisco train approached the crossing the headlight on the locomotive was not lighted and that no warning by bell or whistle was sounded. The Railway Company had evidence that the automatic bell· on the locomotive rang continuously as the train approached the crossing; that the bell had been started ringing at a point several miles from the crossing and had thereafter rung continuously; that the usual and customary blasts of the locomotive whistle were given; and that the headlight was in good condition, was lighted as the engine approached the crossing, and at all times that night prior thereto. The only evidence of the speed of the train as it approached the crossing was the testimony of the trainmen of ten or twelve miles an hour.

Plaintiff's petition charged general negligence and failure to exercise the highest degree of care as to defendant Public Service Company. As to the Railway Company specific negligence was charged in the following respects; failure to slacken speed and operation of the train over the crossing at a high and dangerous rate of speed; failure to keep a proper lookout; failure to ring the bell as the train approached the crossing in alleged "violation" of statute; failure to sound a whistle as it approached the crossing; failure to keep a "headlight burning" in violation of Section 4845, Revised Statutes 1929; and humanitarian negligence, in that, the trainmen "failed to stop" the train "and failed to slacken the speed thereof when they saw or could have seen, plaintiff and the car . . . in a position of imminent peril, and plaintiff oblivious of her danger, in time, . . . to have avoided the collision." The separate answer of each defendant was a general denial. Plaintiff went to the jury on general negligence as to defendant Public Service Company and abandoning the other charges of negligence against the Railway Company, enumerated in her petition, by her instruction numbered 1 submitted as the only grounds of recovery against it; failure in the following respects; (1) to ring a bell, (2) sound a whistle, (3) to have the headlights lighted, and (4) to slacken speed, as the train approached the crossing. The Railway Company's complaint of error in the instruction will be discussed later. Though, as noted, the plaintiff abandoned its charge, against the Railway Company, of negligence under the humanitarian rule, the Public Service Company offered, and the court gave, its Instruction K-9 authorizing the jury to find for plaintiff and against its codefendant the Railway Company upon what the Railway Company denominates "a sort of a humanitarian doctrine." The Railway Company complains that the giving of this instruction was prejudicial to it and constitutes reversible error as to it. On the

other hand, at the request of the Railway Company the court gave its instruction numbered D-2, over the objection and exception of the Public Service Company, who, as appellant, complains here that the instruction was prejudicial, and reversible error, as to it. We will at this time discuss these cross complaints, after which we will examine the assignment of error which the Railway Company makes against plaintiff's Instruction 1, as to it, above noted, and the contention of the Public Service Company that the court erred in refusing its proffered instruction, K-5, relating to damages.

Defendant Public Service Company's given Instruction K-9 against its codefendant, of which the Railway Company complains, tells the jury, that if they "find and believe from the greater weight of the evidence that the street car . . . came to a stop before crossing the railroad crossing . . . and . . . then started up to cross the intersection . . . and that the locomotive engine was then approaching such intersection . . . and that the operator of the street car was oblivious of the approach of such engine, and that the engineer on such locomotive engine saw, or by the exercise of ordinary care could have seen that the street car was about to cross the path of the approaching locomotive engine and was approaching a position of imminent peril, and that the operator of the street car was oblivious thereto, in time thereafter, with the means at hand and with safety to himself and others to have given a warning signal or to have slowed down or stopped the engine in time to avoid a collision between said street car and said locomotive engine, and . . . that the street car and the engine collided, and that as a result thereof, plaintiff was injured, and that the said engineer failed to sound a warning signal on said engine or to slow down or stop such engine . . . then your verdict should be against" the Railway Company "even though you should further find and believe from the evidence, that plaintiff's injuries were contributed to by negligence of Kansas City Public Service Company." We have held that a defendant can complain of an instruction given at the request of a codefendant which affects or "was calculated to affect" the question of his liability to the plaintiff. [Grimes v. Red Line Service, Inc., 337 Mo. 743, 85 S. W. (2d) 767; Barr v. Nafziger Baking Co., 328 Mo. 423, 41 S. W. (2d) 559; Story v. People's Motor Bus, 327 Mo. 719, 37 S. W. (2d) 898.] As we have heretofore observed the instruction authorizes a verdict for plaintiff against the Railway Company on a theory of liability which plaintiff had abandoned and did not rely upon or submit as a ground of recovery against the Railway Company. It will also be noted that the instruction does not present any defensive matter on the part of the Public Service Company acquitting it of negligence contributing to the collision or authorizing a finding that the acts and omissions

predicated were the sole cause of the collision and requiring a verdict in favor of the Public Service Company. The right to sue two or more alleged joint tort-feasors jointly or singly, in one or more actions, is solely with plaintiff and likewise the right to .elect the pleaded grounds or assignments of negligence upon which the case is to be submitted against each of the defendants in a joint action is restricted to the plaintiff. A defendant's liability to plaintiff must be determined thereby and such an instruction as this given on the part of a codefendant introducing and submitting a ground of liability not relied upon or submitted by plaintiff for the mere purpose and in an effort to have the other defendant held jointly liable with it, that it may obtain contribution in respect to the judgment, is we think unquestionably prejudicial to the defendant against whom it is directed. We think it clear that the Public Service Company was not entitled to have this instruction given and that the instruction ''was calculated to affect the question of liability'' of the Railway Company to plaintiff. With this view it is unnecessary for us to review and analyze the evidence upon the Railway's further contention that if it be held, on the assumption that there was substantial evidence to support the instruction, that the Public Service Company was entitled to have the instruction given, that there was not, however, substantial evidence to warrant and sustain a verdict against the Railway Company thereunder. A reading of the evidence herein indicates, as the writer thinks, very clearly why the plaintiff did not choose to submit such a theory for to say the most it is exceedingly doubtful that substantial support therefor is to be found in the evidence.

We come now to the complaint of the Public Service Company against Instruction D-2 given at the request of its codefendant Railway Company. This instruction told the jury, that if they found ''that the street car was not stopped at least ten (10) and not more than twenty (20) feet before reaching the railroad tracks, or that no employee of the Street Railway Company went forward to the tracks of the railroad company for the purpose of ascertaining if a railroad train was approaching, and if you further find that the motorman in charge of the street car undertook to cross the railroad tracks immediately in front of the approaching railroad train, and as a direct result thereof, there was a collision between the street car and the engine of the railroad train, then your verdict must be in favor of the trustees of the St. Louis-San Francisco Railway Company.'' It will be seen at a glance that this instruction is error as to plaintiff but plaintiff had verdict and judgment against the Railway Company and of course is not complaining. It is pointed out that the instruction does not direct a verdict against the Public Service Company but merely authorizes a verdict in favor of the

Railway should the jury find the facts therein hypothesized and the contention is made that, while the instruction is, without question, unduly favorable to its sponsor, the Railway Company, since it does not direct a verdict against the Public Service Company the instruction does not prejudice the Public Service Company in any defense it may have and it cannot therefore complain. In support of this contention the rule well stated in Barr v. Nafziger, supra, is invoked, as follows: "It is well settled that a defendant will not be heard to complain of an instruction on the ground that it is too favorable to its codefendant, or that it prevented a joint verdict against both. (Citing cases.) This is on the theory that the plaintiff is the only one prejudiced by error which allows one of the defendants to escape its liability to plaintiff" (328 Mo. 1. c. 433, 41 S. W. (2d) 1. c. 563). But, as we have before stated, a defendant can complain of an instruction given at the request of a codefendant which affects the question of his liability to plaintiff. [Barr v. Nafziger Baking Co., and other cases cited, supra.] Was the instruction then such as "was calculated to affect the question of liability" of the Public Service Company to plaintiff? The instruction does not require the jury to find that the Railway Company was not negligent in the respects submitted by plaintiff as to it, contributing to cause the collision, and that the negligence of the Public Service Company, as therein hypothesized, was the sole cause of the collision, but directs the jury that they must return a verdict for the Railway Company if they find merely that there was a failure on the part of the Public Service Company to comply with either of the statutory requirements, that is, that it failed to bring the street car to a full stop at least ten and not more than twenty feet before reaching the railroad track, or, that no employee of the Public Service Company went forward to the railroad track to ascertain if a train was approaching without requiring a finding that either such failure was the proximate cause of the collision. Admittedly the motorman did not stop the car at least ten feet before reaching the railroad track and admittedly no employee of the Public Service Company went forward to the railroad track to ascertain whether a train was approaching. The motorman testified that he brought the street car to a full stop within six or eight feet of the railroad track at a point where he could have seen the headlight, if lighted, of a locomotive approaching from either the north or south; that he looked in both directions and listened for a train; that he heard no whistle or bell nor did he see a headlight; and that he then proceeded to cross. There was other testimony that the car was stopped before going on the crossing. Apparently the sole defense of the Public Service Company was that the street car was stopped at a point which was a substantial compliance with the statute and that the failure of the motorman to go forward

to the track was not a proximate cause of the collision in that, as is claimed, he could not by doing so have seen nor heard any more than he did and that the approach of the train in the darkness, without the headlight lighted, without bell or whistle being sounded and at a negligent rate of speed, under the circumstances, was the sole cause of collision. This defense was submitted by the Public Service Company's given Instruction K-2, the more pertinent parts of which, with "if you so find" and like qualification omitted, follows: "Even though you should find . . . that the street car . . . was not brought to a full stop at least ten and not more than twenty feet before reaching . . . the railroad tracks . . . and that an employee of the Street Railway Company did not go forward to the tracks of such Railroad Company for the purpose of ascertaining whether a train was approaching such crossing, yet if you . . . find . . . that the operator of the street car . . . stopped said .· . . car before entering the intersection . . . at a place where he could as conveniently ascertain whether a train was approaching as if he had stopped said car not less than ten nor more than twenty feet from such intersection, and had gone forward to the tracks, and if you further believe that when said street car was stopped . . . the operator . . . looked and listened for the approach of a train . . . and that the failure to stop the street car not less than ten feet nor more than twenty feet and the failure to go forward to the tracks of the railroad . . . did not directly contribute to plaintiff's injuries, and if you further find . . . that the operator of the street car failed to see or hear any train . . . approaching and that the night was dark and that the headlight was not burning on the railroad engine, and that no bell or whistle was sounded on the approaching engine, and that the street car operator exercised the highest degree of care in attempting to ascertain whether a train was approaching and in causing the street car to cross such intersection, and if you further find and believe that the street car and its appliances were in good condition, then your verdict should be in favor of Kansas City Public Service Company." There is no contributory negligence on the part of plaintiff in this case. Plaintiff was in no way at fault. Nor was the collision the result of an accident in the legal sense of that term. Indisputably the collision was caused by the negligence of one or the other of the defendants or the negligence of both concurring. The Public Service Company's Instruction K-2, the gist of which we have set out, supra, tells the jury that "even though" the motorman in charge of the street car did not comply with the statutory requirements that if they found the facts as therein hypothesized and that his failure to comply with the statutory requirements was not a proximate cause of the collision their verdict should be for the Public Service Company. The Rail-

way Company however interposed this Instruction D-2 which though not directing a verdict against the Public Service Company nevertheless tells the jury, in effect, that if they find that the motorman did not literally comply with the statutory command, which he admittedly did not, that, disregarding any evidence of negligence on the part of the Railway as a contributing factor, their "verdict must be in favor" of the Railway; thereby inferentially and by implication and imputation, telling the jury that such failure of the motorman, in and of itself, constituted the sole proximate cause of the collision and absolved the Railway Company; otherwise how could that alone acquit the Railway Company. We are inclined to think that the instruction necessarily tended to mislead and confuse the jury on this issue and that by its plain and certain implication the instruction "was calculated to affect" prejudicially the Public Service Company's defense submitted by its Instruction K-2 and therefore to constitute error as to it.

We heretofore mentioned that the Railway Company, as appellant, claims error in plaintiff's Instruction 1; submitting negligence upon which recovery against it is sought. The instruction told the jury, that if they found that the Frisco employees in charge of the freight train (omitting "if so" and "you so find," etc.) "failed to ring a bell as their train approached said crossing and failed to keep it ringing until it had crossed said crossing, and failed to sound a whistle as they approached said crossing and did not thereafter sound said whistle at intervals until it had crossed said crossing, and that as their locomotive approached said crossing they failed to have their headlight lighted, and failed to slacken their speed, and because of such failure, if any, and as a direct result thereof, plaintiff was injured, if you find that she was injured, then you will find" the Frisco agents, servants, etc., "were negligent and your verdict must be for plaintiff and against defendant" Railway Company. The Railway Company points out that the instruction does not require the jury to find that any of the several omissions constituted negligence on the part of the trainmen but advises them as a matter of law that such failure was negligence. It is conceded that violation of a statute is negligence *per se* or as a matter of law. Though plaintiff's petition seems to allege a violation of the duty to sound a bell required by Section 4756, Revised Statutes 1929, that statutory provision applies only to the crossing of a railroad track over a "traveled public road or street." This was a private crossing of the street car tracks and the railroad track. The railroad did not cross a street, road or highway at this point. So the failure to ring a bell or sound a whistle, if any, was not a violation of Section 4756, supra. Nor was there any statutory duty to slacken the speed. Therefore failure to ring the bell, sound the whistle or slacken speed, would

not be negligence as a matter of law and whether either such omission was negligence, under the existing circumstances and conditions, would be for the jury to determine. However the omission to have the headlight lighted as the locomotive approached the crossing would be a violation of Section 4845, Revised Statutes 1929, and negligence *per se*. The omissions are stated in the conjunctive, that is, if the jury find that the railway employees, in charge of the train, failed to ring the bell, *and* failed to sound a whistle, *and* failed to slacken speed, *and* failed to have a headlight lighted, as the train approached the crossing. Plaintiff says the jury were required to find all the omissions enumerated and therefore must necessarily have found that the headlight was not lighted as the train approached the crossing, which was negligence as a matter of law, and, following the instruction, to have found that "because of such failure" to have a headlight lighted, "and as a direct result thereof, plaintiff was injured." Appellant Railway Company concedes the omissions are submitted in the conjunctive but says that when the instruction comes to the vital matter of proximate cause it treats as several and separate the various omissions and failures previously submitted and authorizes a verdict against it upon a finding that any one, or more, of such omissions was a proximate cause of plaintiff's injury. Having told the jury that if they find the four failures (or omissions) submitted the instruction continues, "and that *because of such failure, if any,* and as a direct result thereof, plaintiff was injured," etc. (Italics ours.) Appellant Railway contends that the instruction must, and can only, be construed as telling the jury that their verdict must be for plaintiff if they find any such failure, that is, any one or more of the failures enumerated, was the proximate cause of plaintiff's injury. It is said "any does not mean all" but "one (or some) indifferently out of a number." It might seem apparent to court or lawyer that plaintiff here used the words "if any" to avoid an assumption of failure and that upon a consideration of the instruction as a whole it was intended to require the jury to find; first, that the employees of the railway in charge of the train failed to do all the (four) things enumerated; and, second, that such failure proximately contributed to cause plaintiff's injury. Since, as the instruction is worded, there appears to be some basis for the criticism that it is calculated to convey to a jury the meaning which appellant ascribes to it, plaintiff will doubtless, on another trial, so frame it as to obviate that, as well as other, criticism.

 Plaintiff had evidence, the testimony of numerous witnesses, tending to show that prior to the injuries received in the collision she had apparently been able-bodied and in good health, and that since she was thirteen years of age she had done various kinds of work, as a domestic, waitress in a restaurant and salesgirl. On September

24, 1933, approximately a month before this collision plaintiff was injured when she jumped from a moving automobile to escape the advances of a man companion. She said she suffered a "gash in the back of the head" and was "bruised and scratched." She spent ten days in a hospital at that time and a week or so thereafter convalescing at her sister's home. She filed an action for damages alleging she sustained these injuries; head lacerated, internal organs injured and displaced, back and spine injured, and a severe sprain or strain in the lower left portion of the abdomen causing a severe swelling." The action was settled without trial. However, plaintiff testified that she had fully recovered, prior to the date of the collision, from the injuries sustained in jumping from the automobile. Following the collision she was taken to the Independence Sanitarium where she was placed in the care of Dr. Krimminger. He testified to his findings as to her injuries at that time, in detail, as follows: "Minor lacerations of the face, generally bruised, left leg immediately below the hip lacerated to the region of the crest of the ilium; lacerations of the left ilium, bruises to the right, paralysis of motor and sensory nerves from the right hip to the right ankle; lacerations to the peroneal muscles on the right side; inability to void; marked tenderness in parenteral, paralysis of the bladder; tenderness throughout the chest, general, extreme tenderness in the small of the back." Continuing a statement of his findings he said, there was "total paralysis of both legs;" and that this "total paralysis entirely cleared up in about 10 days," but when plaintiff left the hospital, on November 28, 1933, "she did not have complete control of her legs, she still had partial paralysis." The trial was in June, 1934, about eight months after the collision. Plaintiff adduced evidence tending to show loss of weight, impairment of sensation, that she had been unable to work, that she suffered pain in her back, that she had no sensation of passing urine and was unable to retain it, that she lacked control of her legs and that her legs were weak so that she could not "stand on them without support," that in moving about the house she had "to hold to a chair or a table" and that "most of the time she used crutches," especially when she would leave the house. One of the doctors called as a witness by plaintiff said in his opinion the "likelihood" of the conditions described "disappearing is rather small;" and her other medical expert, Dr. Thompson, said: "I believe she will have some improvement but there is going to be a certain extent of permanency" and "I don't believe she will ever entirely recover." Plaintiff's expert medical witnesses gave an opinion that in the collision plaintiff sustained a concussion of the spinal cord and that the inability to control her legs, impairment to some extent of sensation and other conditions above mentioned resulted therefrom. It is apparent that the foregoing constitutes sub-

stantial evidence from which the jury could readily find casual connection and conclude that the injuries and conditions mentioned were caused by and resulted from the collision.

This brings us to a consideration of the remaining assignment of error in this case, made by the Public Service Company. Plaintiff claimed to have sustained certain other injuries, as the result of the collision which are not mentioned in the foregoing review of this phase of the case, between which and the collision the Public Service Company says plaintiff did not establish any causal connection. On November 15, 1933, which was twenty-four days after the collision and plaintiff's admittance to the Sanitarium, an operation was performed. Because it is not entirely clear from the testimony of the doctor who testified directly about the operation, which we later set out, we take our finding of what was done from the history of the operation as given by plaintiff's counsel in propounding an inquiry to one of plaintiff's expert medical witnesses, that is, that in this operation "her appendix and Fallopian tubes with a part of the ovary were removed." Plaintiff· stated that a Dr. Green performed the operation. He did not testify. However, Dr. Krimminger, whom we have heretofore mentioned, stated that he assisted in the operation and gave the only direct testimony about it. He testified as follows:

"Q. Now, Doctor, during the time this young lady was in the Hospital was an operation performed? A. Yes, sir.

"Q. And what was that for? A. Her appendix plus a cyst of the ovary and tubes, and this cyst contained fluid.

"Q. What was the reason for that operation? A. Well, because of a diagnosis of that nature.

"Q. Was a laboratory examination made? A. Yes, sir.

"Q. What did that consist of? A. Now, Dr. Kirtshoner made this report of operative diagnosis; Acute appendicitis with fibrous hydrosalpinx, that means fluid in the tubes, together with an ovary cyst. That was the operative diagnosis. After the operation the cyst and appendix was examined by technicians. . . . . The walls of the appendix were normal and somewhat moist and showed. the blood supply partially obstructed. One tube was of normal length and width and showed little pathological change . . . The other tube had grown together with the ovary, but the tube had a normal appearance. The ovary was enlarged and showed a large hemorrhage cyst.

"Q. Having in mind this girl had been in an accident wherein a street car was run into by a Frisco engine and she was knocked unconscious and suffered the injury which she had when you saw her immediately after the accident, could and would that accident have produced the condition such as to make necessary this oper-

ation? A. If you will pardon me I would like to answer that this way. The condition here present following this young lady when she was brought into the hospital—whether or not it was traumatic is hard for me to state.

"Q. Have you formed an opinion on that, could it have been of traumatic origin? A. Yes, it could have been."

Cross-Examination.

"Q. Doctor, it is the opinion of the majority in the medical profession that it is not possible for trauma or injury directly to the part involved to cause appendicitis, is it not? A. Well, I don't know about the judgment of other physicians.

"Q. You don't know about that? A. I couldn't swear to that.

"Q. But it is true, generally speaking, that appendicitis does not come from trauma or injury? A. If you will pardon the expression, the Lord only knows how that question should be answered.

"Q. But this is true, people have appendicitis because something gets wrong with the appendix and that is about as much as you can state about it? A. That depends on a great many things.

"Q. Did you see her appendix after it was taken out? A. Yes, sir, I assisted in removing it.

"Q. Was there anything about the looks of the appendix after it had been taken out to indicate injury had been received? A. Well, I didn't examine it for that—no, sir.

"Q. You didn't see any? A. No, sir.

"Q. You didn't see anything about the appendix and the surrounding organs when you took it out that led you to believe the appendix had received injury? A. That I can not answer. The only thing that causes appendicitis is a distracted blood supply—which we had in this case.

"Q. How that comes about you don't know? A. No. sir."

After stating the nature of the operation and what was done, as we mentioned above, plaintiff's counsel then asked plaintiff's expert medical witness, Dr. Thompson, this question: "Now, Doctor with this injury (the diseased appendix, ovary and Fallopian tubes) and evidence of a severe blow in this region of the body and in the back, could that have produced the condition such as necessitated this operation? A. That is speculative. Q. Might it have? A. I wouldn't say it would or it wouldn't. Q. Could it have produced it? A. I am not . . . able to tell about that."

One of defendant Public Service Company's expert medical witnesses, a Dr. Neal, was asked the following questions and gave the following answers thereto on cross-examination by counsel for the Railway:

"Q. Have you read the hospital record of this operation for appendicitis and Fallopian cyst? A. I have. Q. Assuming that the

facts therein stated are true, in your opinion was the necessity for that operation of traumatic origin? A. It was not.'' On cross-examination of Dr. Thompson by counsel for plaintiff, the following occurred: ''Q. Could trauma or injury produce a hydrosalpinx? A. Not unless there was an injury to the walls of the abdomen and the contents.''

There was no evidence that an injury to the walls of the abdomen was disclosed. Nor did the doctor who was present and assisted in the operation nor any of the medical experts testify that if the dis-- eased appendix, ovary and Fallopian tubes had resulted from trauma or violence received in the collision certain conditions evidencing that would have existed and that same were present in this instance. We have set out *verbatim* the evidence, relating to these alleged injuries, upon which plaintiff relies. The burden was upon plaintiff to establish the causal connection. The sum of the evidence adduced to meet that burden is that in the collision plaintiff sustained bruises about the body; twenty-four days later a diseased condition of the appendix, Fallopian tubes and ovary was found to exist, and that ''one tube had grown together with the ovary;'' the appendix, Fallopian tubes and an ovary were removed; the Doctor who treated plaintiff and assisted in the operation refused to venture an opinion that such condition ''was traumatic'' and would say only that in his opinion such a condition ''could have been of traumatic origin.'' This did not constitute substantial evidence tending to show causal connection. Upon this evidence any inference or finding by the jury that the diseased condition of these internal organs resulted from external trauma or violence received in the collision would be mere guess and speculation. The opinion of Dr. Krimminger that such a condition ''could have been of traumatic origin'' is ''no more than assurance'' that such a result was possible and was not substantial evidence that such condition did result from the external trauma or violence sustained in the collision, and, as we have noted, there was no other sufficient evidence tending to show such cause. [Kimmie v. Terminal Railroad Assn., 334 Mo. 596, 66 S. W. (2d) 561; Derschow v. St. Louis Public Service Co., 339 Mo. 63, 95 S. W. (2d) 1173; Adelsberger v. Sheehy, 332 Mo. 954, 59 S. W. (2d) 644; Cox v. M.-K.-T. Railroad Co., 335 Mo. 1226, 76 S. W. (2d) 411.]

At the conclusion of all the evidence the defendant Public Service Company requested, but the court refused the following instruction numbered K-5 telling the jury, ''that the plaintiff in this case is not entitled to recover on account of an operation involving the removal of her appendix, of a cyst, or her Fallopian tubes, nor on account of the conditions making such operation necessary.'' It follows that, since no sufficient and substantial evidence was adduced tending to establish the causal connection between the conditions re-

ferred to in the instruction and the collision, the defendant was entitled to the instruction and the refusal thereof error. It must be assumed that the jury took these alleged injuries into consideration in assessing damages and it can hardly be doubted that injuries of such a nature considerably augmented the damages allowed. There is not therefore any basis for arriving at a *remittitur*.

For the errors noted the judgment must be reversed and the cause remanded as to both defendants. It is so ordered. *Hyde* and *Bradley, CC.,* concur

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur, except *Douglas, J.,* not voting because not a member of the court when cause was submitted.