HARRY H. HUNT v. ARMOUR & COMPANY, a Corporation, Appellant—
136 S. W. (2d) 312.

Division One, January 23, 1940.

*Brown, Douglas & Brown* for appellant.

*Randolph & Randolph* and *Nile L. Vermillion* for respondent.

HYDE, C.—This is an action for damages for disability (from rheumatism, arthritis, and neuritis) alleged to have resulted from exposure while plaintiff was working for defendant. Violation of Section 13267, Revised Statutes 1929, is claimed to make defendant liable. Plaintiff had a verdict for $14,000 and defendant has appealed from the judgment entered.

Defendant assigns as error the refusal of its instruction, in the nature of a demurrer to the evidence, directing a verdict at the close of the evidence. Defendant contends that Section 13267, Revised Statutes 1929, is unconstitutional both because of being too vague and indefinite (citing Secs. 22 and 30, Art. II, Const. of Mo.; and Sixth and Fourteenth Amendments, Const. of U. S.); and because the Legislature, in adopting the Act, did not comply with Section 28, Article IV, of the Constitution of Missouri. [See Laws 1917, p. 323.] The Act, including title, was as follows:

"An act to provide for the erection, maintenance and equipment of suitable buildings for the protection of the safety, health and comfort of employees engaged in the construction and repair of freight and passenger cars and car trucks used within this State, providing a penalty for the violation of the same, and fixing the time for this act to become operative.

"Be it enacted by the General Assembly of the State of Missouri, as follows:

"Section 1. Houses for Employees Required, etc.—Every person, firm, corporation, or receiver of such person, firm or corporation, engaged within this state in the construction or repairing of passenger or freight cars or car trucks used in the transportation of passengers or freight by rail, shall erect and maintain a building or buildings at every point or place within this state where such construction or repairing is done, and where six or more men are regularly employed on such work. The building or buildings provided for in this section shall be so constructed and equipped as to fully protect all employees engaged in such construction or repair work from exposure to cold, rain, sleet, snow and all inclement weather during the hours of employment of such employees, providing that the provisions of this act shall not apply where ordinary light repairs are required. The term, light repairs, as used in this act shall be such repairs as can be made to cars in switching yard in thirty minutes or less, or which may be made in less time than would be required to switch such car or cars to the repair building provided for in this Act.

"Sec. 2. Violation—Penalty.—Any person, firm, corporation or receiver of such person, firm or corporation who shall violate the provisions of this act or shall require men regularly employed by them in the construction and repair of such passenger and freight cars to work outside of the building as provided for in this act, shall be deemed guilty of a misdemeanor and upon conviction thereof in any court of competent jurisdiction shall be fined in the sum of not less than $100.00 nor more than $500.00, for such offense and each day of such violation shall constitute a separate offense.

"Sec. 3. Take Effect—When.—This act shall take effect and be in force on and after the first day of January, 1918.

"Approved April 10, 1917."

 The enforcement of Section 13267, Revised Statutes 1929 (Sec. 6832, R. S. 1919) as a criminal statute (as provided in Sec. 13268, R. S. 1929, Sec. 2 of original act) has been enjoined on the ground that it was unconstitutional (upon defendant's first ground above stated, except that applicability of amendments to the U. S. Constitution was not ruled), in Wabash Ry. Co. v. O'Bryan, 285 Fed. 583; and we note that the entire act (Secs. 13267 and 13268, R. S. 1929) was repealed by our last Legislature. [Laws 1939, p. 475.] Plaintiff, however, contends that if Section 13268, making noncompliance a misdemeanor, be eliminated from consideration, Section 13627 would remain a valid remedial statute upon which civil liability for damages caused by noncompliance could be based. Our prior decisions, concerning statutes making general provisions for health and safety of employees, are in accord with this contention. [See Boll v. Condie-Bray Glass Co., 321 Mo. 92, 11 S. W. (2d) 48; Smith v. Harbison-Walker Refractories Co., 340 Mo. 389, 100 S. W. (2d) 909.] At least, general standards might be approved as a basis for civil liability which would not be sufficiently definite for validity of a criminal statute.

 However, Section 28 of Article IV provides that "no bill (with certain specific exceptions) shall contain more than one subject, which shall be clearly expressed in its title." It is obvious that there is a limitation in the title of this act which is not contained in or recognized by either section of the act. That is the title states that the act is "to provide for the erection, maintenance and equipment of suitable buildings" to protect employees engaged in "repair of freight and passenger cars and car trucks *used within this state;*" while the body of the act makes such requirement apply to "repairing of passenger or freight cars or car trucks used in the transportation of passenger or freight by rail." We only consider "repairing" because "construction" is not involved under the facts of this case.

We have held that "the title need not express limitations in the body of the act, but where the title is restrictive the act must be also;" that "where the title of an act descends into particulars and details,

the act must conform to the title as thus limited by the particulars and details;'' that ''then, not the general subject within which such particulars fall, but *the particulars stated, become the subject* stated in the title;'' and that ''if the descent to particulars is sufficiently definite that the express enumeration is affirmatively misleading as to the intent to include others, the other matter so included is not within the title, even though the designation of particulars is preceded by a general title.'' [City of Columbia v. State Public Service Commission, 329 Mo. 38, 43 S. W. (2d) 813, in which prior authorities were reviewed; see also the later cases of State ex rel. Department of Penal Institutions v. Becker, 329 Mo. 1041, 47 S. W. (2d) 781; Sherrill v. Brantley, 334 Mo. 497, 66 S. W. (2d) 529; Fidelity Adjustment Co. v. Cook, 339 Mo. 45, 95 S. W. (2d) 1162.] In each of these cases, there were provisions of the act, which were not covered by the title, so that the act was broader than the title in certain respects. Therefore, in those cases the provisions which were beyond the title were held void. It follows that this act must be held void in so far as it goes beyond the limitation in the title making the act apply only to the repair of cars ''used within this State.'' Whatever may have been meant by the limitation in title (whether to make it apply to all cars not in use in interstate transportation or only to cars in actual intrastate use at the time of making repairs), the act is broad enough to cover every car brought into this State, even though still in actual use in interstate transportation while being repaired. It has been held that an act as broad as this in its application would conflict with the Federal Safety Appliance Act (U. S. C. A., Title 45, Sec. 13) which ''requires that defective cars upon the lines of carriers subject to the act be repaired at the place where they are first discovered to be defective, if feasible; otherwise, at the nearest available repair point.'' [Chicago & Northwestern Ry. Co. v. Railroad & Warehouse Comm., 280 Fed. 387, l. c. 397.] This limitation in the title must have been intended to mean something and it seems reasonable to believe the intent was to keep it from being in conflict with Federal legislation under the commerce clause of the Constitution of the United States. [Sec. I, Art. 8, Cl. 3; see New York Central Railroad Co. v. Winfield, 244 U. S. 147, 37 Sup. Ct. 546, 61 L. Ed. 1045.] However, there is nothing in the act to show what it was intended to mean. It seems doubtful, therefore, that there is enough left of the act so that it would be possible to determine to what repair work it was intended to apply.

Whether failure to define the meaning of this limitation in the title would make the whole act invalid because of such indefiniteness, it is unnecessary to decide here because, whatever it could mean, plaintiff did not show himself to be within it. Even if the act could be upheld as valid, either as to cars in use in intrastate transportation

or as to any cars not in use in interstate transportation, the burden of proving that plaintiff's work was within the act would be upon plaintiff. Not only did plaintiff fail to show that the cars repaired in defendant's plant were not in interstate transportation, but, on the contrary, the following affirmatively appears from plaintiff's own testimony:

"Q. . . . These cars were cars that went from Missouri to all states, were they not? A. Yes, sir. Q. They were used in what is known as interstate commerce? A. Yes, sir.

It also appears from plaintiff's evidence that all the cars repaired at defendant's plant were "refrigerator cars for meat;" that "when the cars got in there we went right now to work because they needed them on the dock;" that they "put in couplers, wheels, fixed roofs (safety walk), brake beams;" that this repair work was all done on three switch tracks holding about twenty-nine cars each; that in recent years (at least the last ten years of plaintiff's service) all heavy repairs, except wheels and bolsters (springs) and couplers, were done in Chicago; that heavy repairs made in Chicago included putting on roofs and siding, removing under frames and blacksmith work; that it would take "hour and a half or something like that" to make the heaviest repairs (changing wheels or bolsters) made at the plant; that "two or three hours on one car" was "the longest time you would take on one car," and that if "you would have to take off more than one pair of wheels and put in more than one bolster . . . new brake beams and new couplers in the same car . . . from the time the car came in the yard until it was ready to go out completely repaired, . . . all of that would take a half day—six hours;" but there was no showing that all of these enumerated repairs were ever made on a single car and defendant's foreman said "we haven't applied a truck bolster for two years" and "we haven't applied a coupler in better than a year." Defendant's foreman also testified that "all of our regular and heavy repair work, the car goes into the Chicago shop;" that "we make light repairs only;" that these were "repairs to wheels, couplers, truck sides, truck bolsters, . . . truck springs, bolster nuts, cotter keys;" that "some of them only take a minute or two or twenty to thirty minutes at the most;" and that "the application of a wheel would require an hour for two men." It has been frequently ruled that temporarily diverting a car or engine from its regular use for the purpose of making running repairs does not withdraw it from its interstate use or break the continuity of such use. [McMahen v. Mo. Pac. Ry. Co. (Ark), 53 S. W. (2d) 998, certiorari denied 289 U. S. 729, 53 Sup. Ct. 526, 77 L. Ed. 1479; Morrison v. Terminal Railroad Assn. (Mo. App.), 57 S. W. (2d) 775; Harlan v. Wabash Railroad Co., 335 Mo. 414, 73 S. W. (2d) 749; Cox v. M.-K.-T. Railroad Co., 335 Mo. 1226, 76 S. W. (2d) 411; Delk v. St. L. & S.

F. Railroad Co., 220 U. S. 580, 31 Sup. Ct. 617, 55 L. Ed. 590; Great Northern Ry. Co. v. Otos, 239 U. S. 349, 36 Sup. Ct. 124, 60 L. Ed. 322; Lorick v. Seaboard Air Line Railroad Co. (S. C.), 86 S. E. 675, affirmed 243 U. S. 572, 37 Sup. Ct. 440, 61 L. Ed. 907; M., St. P. & S. Ste. M. Ry. Co. v. Goneau, 269 U. S. 406, 46 Sup. Ct. 129, 70 L. Ed. 335; B. & O. Railroad Co. v. Kast, 299 Fed. 419, certiorari denied 266 U. S. 613, 45 Sup. Ct. 95, 69 L. Ed. 468.] Our conclusion is that defendant's demurrer to the evidence should have been sustained on this ground.

■. Furthermore, we think defendant's contention, that plaintiff did not have substantial evidence to show that his arthritic condition was caused by working in the open yards, must also be sustained. It was shown that plaintiff had also worked in the open as a switchman, brakeman, and fireman for many years before he was employed by defendant. It was also shown that he frequently went fishing and hunting and that when he "would go hunting, it didn't make any difference what the weather was." Plaintiff was fifty-nine years old at the time of the trial. Further facts, which the evidence tended to show, appear from the hypothetical questions in the testimony hereinafter quoted. It is now settled that, in matters where the evidence does not exclude all other causes and in which no layman could know or have reasonable basis for an inference as to cause, opinions of doctors that a certain occurrence or condition might, could, or would produce a certain result is no more than an assurance that such a result was scientifically possible, and does not alone constitute substantial evidence that such occurrence or condition did cause it. [O'Leary v. Scullin Steel Co., 303 Mo. 363; 260 S. W. 55; Adelsberger v. Sheehy, 332 Mo. 954, 59 S. W. (2d) 644, 336 Mo. 497, 79 S. W. (2d) 109; Kimmie v. Terminal Railroad Assn., 334 Mo. 596, 66 S. W. (2d) 561; Cox v. M.-K.-T. Railroad Co., 335 Mo. 1226, 76 S. W. (2d) 411; Derschow v. St. Louis Public Service Co., 339 Mo. 63, 95 S. W. (2d) 1173; Bieser v. Goran, 340 Mo. 354, 100 S. W. (2d) 897; Kourik v. English, 340 Mo. 367, 100 S. W. (2d) 901; Berry v. Kansas City Pub. Serv. Co., 341 Mo. 658, 108 S. W. (2d) 98.]

In Adelsberger v. Sheehy, supra, this court said:

"The burden was on the plaintiff to show the cause. Evidence that the condition might or could have been caused by either injury or disease without any substantial showing as to which of the possible causes did produce the condition, furnishes no basis from which a jury could determine the cause."

Likewise in the Kimmie case, quoted in the Cox case and followed in the other cases, we said:

"No layman could know or have any reasonable basis for an inference that it did result from it. The opinion of the doctors that it might, could or would result from the fall is no more than an

assurance that such a result was scientifically possible. . . . It was not substantial evidence that it did result from it and there was not here other ample evidence, 'tending to exclude all other causes.' . . . It left the whole matter to speculation and conjecture.''

Plaintiff's medical evidence was the testimony of one doctor who had examined plaintiff only after he left defendant's employ. He said:

''The man is suffering from multiple osteoarthritis, or chronic inflammation of the bone and joints of the shoulders, elbows, wrists, and hands, and back. . . . The only cause I could make out from the man's history was a history of prolonged exposure to the elements and inclement weather. In other words, I could find, or make out no evidence of infection any place about his body, teeth, tonsils, sinuses, colon, or anything else that might act as the focus of infection of any disease. His history gave no evidence of having had disease in these regions whatever. The only history he gave, suggestive of infection, was frequent colds.''

This doctor also testified as follows:

''Q. Doctor, assuming for the purpose of your answer to this next question, that this plaintiff here was employed in the car shops, car repair department of Armour & Company, where they repair these cars, refrigerator cars, that he first began his employment in 1915 and continued to the spring of 1934, when he was unable to work any longer, that during that time he constantly worked out in the open all of the year around, and that the place where this work was done, the ground was wet, practically all the time, that especially during the last three years of his work, he frequently had to lie on his back and get on his hands and knees and get under cars and cut off brake beams and when he would lie there, there would even be water, snow and slush and sleet on the ground; that he tried to protect himself from that as best he could by using a piece of cardboard to lie on; frequently get himself wet and get his clothing wet; sometimes have to change his clothing as often as two or three times a day because of being wet; that that condition continued until the spring of 1934; that especially during the latter several years he worked there he had one cold after another, just about get over a cold when he would get another cold, especially in the fall and winter and spring when the weather was bad and that sometimes he became wet during bad weather from the rain and the dripping off of the car he was working on and also from the drainings of the car, water and brine, and that along in 1933, he first commenced to notice some pain, stiffness and soreness in his left arm about the region of the elbow and that gradually moved into his shoulder until finally along in the spring of 1934 one night his right arm went bad on him all of a sudden and he waked up the next day and both of his arms were

out, so that he could not work; since that time he has the condition which you know he has from your examination of him; in your opinion, doctor, would that exposure working under the conditions that I have described, caused the condition that Mr. Hunt now has? A. It could, yes. Q. And since you have made the examination of him and eliminated the other possibilities, what do you say now as to whether or not those working conditions, the constant exposure and wetting that way, were the cause of his condition? A. It is the only factor I could find which might be a cause. . . . If you are going to grant exposure did cause this condition, perhaps it caught the man when he was more fatigued one time than another, or perhaps it was just a continual exposure, time after time until the disease got such a start that it went on by itself. As to that I could not say.''

He further testified, on cross-examination, as follows:

''Q. Focal infection is now recognized as one of the important sources of arthritis, one of the sources to which they can definitely point? A. That is correct. Q. Focal infection means an infection arising in your system from diseased teeth, diseased tonsils, or other parts of your body? A. Yes, it means a chronic infection in one part of the body which may cause damage in another part of the body. Q. It can be pyolitis, colitis, diseased teeth or tonsils? A. Yes, and a lot of others. Q. That is one of the commonest and best recognized causes of arthritis? A. I think it is the most logical and the best. Q. Did you obtain a history from Mr. Hunt of having had decayed teeth which had been removed? A. Yes, sir. Q. Was there any reason in your mind why you ruled out the possibility of that factor's having caused his arthritis? A. Yes, sir. Q. Will you explain your reason for ruling that out? A. My history was the teeth were removed twenty years ago. . . . Q. It was possible, is it not, that infection from the teeth, even in this case, could have been set up and that the damage done by that infection could have continued and could have caused this condition even though it were fifteen years after. A. I don't know, Mr. Brown. That is purely speculation on the part of anyone. Q. Your opinion as to the cause of this man's condition is purely speculative at best, is it not, with all these various causes and all these various sources? A. That is right. We just try to arrive at the most logical conclusion. . . . If his teeth, any infection from his teeth was the cause of the onset of his arthritis which at that time did not become sufficiently pronounced to cause the trouble, pain or other symptoms, you would have to conclude that the condition following the removal of his teeth became arrested and that something else, or for some reason it flared up again later on. Now, that is a possibility but whether it is so or not, I do not know. . . . Q. What reason do you have to rule out all these possibilities which you have stated and attribute this man's condition to the one specific cause of exposure? A.

Perhaps I could make myself a little more clear to say this: I cannot attempt to rule out every fact which might, or which could, at least sometimes, have a bearing on arthritic changes. The only thing I could say is in my opinion the man's condition could, and apparently from the history, if I may take that, as the truth, have been more apt to have been caused by frequent colds which are infections and which·act as a foci of infection. . . . It may be that some of the causes which you have enumerated have had little, or a great deal to do with this man's condition. If I am to believe the history that was given to me, the most logical thing I can imagine is that exposure and constant colds from exposure which are infections, probably form some part, a great part, in this man's condition. . . . Leaving colds out completely, dealing directly with this man's condition I would not know what to say was the cause of his arthritis. I would say that I believed exposure did have something to do with it but how much it had, from there on, would be just as problematical as metabolism or old age. . . . Q. You think the hard working man has arthritis more than the inside worker who is not working hard? A. The hard worker is naturally put up against more causes. The hard worker is going to spend some time outdoors. He is going to have colds, infections, that could cause it, where the inside worker it is only logical to suppose is going to enjoy, probably, a little better health. Q. The classification you have made is with respect to the hard worker as opposed to the worker who is not working so hard? A. Yes. . . . Q. The question I had in mind, aside from the amount of work done, you have never noticed any difference in the amount of arthritic patients between persons merely because they worked inside or outdoors? A. No, I have not. . . . I will ask you to assume for the purpose of this question that Mr. Hunt commenced this work in 1915; that prior to that time he had spent at least six years braking, or doing railroad work which took him out in the elements to the extent that your common knowledge would give you. As to that railroad work, in addition to braking, he fired, which is heavy work, I believe. Can you explain why, doctor, he would go on for at least twenty-six years without suffering this condition and why this exposure would have an effect upon him that it had not had for twenty-six years? A. Nobody can explain it. . . . Q. Doctor, if the exposure which has been described to you, in this man's history, if the conditions under which he worked were such as to produce this condition in him, you would expect, would you not, it would have some effect upon all, or at least, some of the other persons working under the same conditions? A. Well, the possibility of having such an effect in other persons is naturally present. Whether or not it would, no one could tell.''

This doctor also said:

''Of course, practically everyone after reaching middle life is going

to have some arthritic changes in some of the joints of the body but whether sufficient to cause disability is another question. . . . It is one of the diseases of wear and tear. . . . Q. Is it your opinion that age, when it causes arthritis goes just so far and stops? A. When age causes arthritis, I believe its progress is very, very slow. . . . Q. Granted that in age the progress is usually slow and that the ordinary person who has arthritis continues and may not even notice it, that still doesn't indicate but that once the condition has started, as it has in Mr. Hunt, it might continue independent of all other causes to the point in which you now find it? A. It seems to me very doubtful that conditions such as Mr. Hunt shows now would arise, independent of all other causes. It might. That is perfectly true. . . . It might, but as you say, there are so many factors working in this case that for one to say that metabolic changes, his metabolism was a cause is difficult. In other words, you mean indigestion, digestion, elimination of the waste products. There is no doubt but that in some cases that can be a determining factor.''

It will be noted that this doctor's answer to the hypothetical question stating plaintiff's evidence was that these conditions ''*could*'' have caused plaintiff's arthritis; that when asked directly if this was the cause he called it a factor ''which *might* be a cause;'' that he thought plaintiff's decayed teeth starting it was ''a *possibility;*'' that his ''opinion on this man's condition is purely *speculative* at best;'' that ''it *might* . . . arise independent of all other causes'' from metabolic changes due to age; that he thought it ''*could* . . . have been more apt to have been caused by frequent colds'' contracted while working for defendant; that he considered chronic focal infection ''the most logical'' cause of arthritis; that other causes enumerated ''*may*'' . . . have had a little or a great deal to do with this man's condition;'' that exposure and colds ''*probably* form some part, a great part in this man's condition''; that he had not noticed any difference in the amount of arthritic patients between persons merely because they worked inside or outdoors;'' that it is ''one of the diseases of wear and tear'' to which hard workers are subject; and that ''no one could tell'' whether conditions under which plaintiff worked would produce the same condition in others. Our analysis of this testimony, as a whole, is that it amounts to no more than an assurance that it was scientifically possible for plaintiff's arthritis to have been caused by his working conditions. It tended to show other causes that might or could have caused it. Therefore, it is not sufficiently definite to be substantial evidence to show that his work in defendant's employ did cause it, but instead left the jury to base their verdict, on this essential issue, on speculation and conjecture. Defendant's demurrer to the evidence also should have been sustained on this ground.

The judgment is reversed. *Bradley* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.